Jerry **MALTZ, Marble Life of Houston, Nick Began, Marble Care, Doug Selik, Marble Life of San Diego, Ellen Lynch and Marble Life of S. Orange County, Plaintiffs,**

v.

**UNION CARBIDE CHEMICALS & PLASTICS COMPANY, INC., Union Carbide Corp., Ralph Lutjen, David M. Jones, R.D. Kennedy and Michael Neary, Defendants.**

Jerry **MALTZ, Marble Life of Houston, Nick Began, Marble Care, Doug Selik, Marble Life of San Diego, Ellen Lynch and Marble Life of S. Orange County, Plaintiffs,**

v.

**UNION CARBIDE MARBLE CARE, INC. Gerald Ehrens, Richard W. Brookcman, Reed Freeman, John Clerico, David M. Jones and Michael Negro, Defendants.**

Nos. 96 Civ. 2512( KMW) (THK), 96 Civ. 2697(KMW) (THK).

United States District Court, S.D. New York.

Jan. 20, 1998.

Randall O. Sorrels, Abraham, Watkins, Nichols, Ballard & Friend, Houston, TX.

Daniel Gildin, Kaufmann, Feiner, Yamin, Gildin & Robbins, New York City.

## ORDER

KIMBA M. WOOD, District Judge.

In a Report and Recommendation dated May 20, 1997 (the "Report"), Magistrate Judge Theodore H. Katz recommended that defendants' motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) be granted in part and denied in part. Defendants (other than Michael Neary) have filed timely objection to the Report. These defendants object to the recommendation of the Report that defendants' motion to dismiss be denied as to: (1) plaintiffs, fraud claims against all the individual defendants except Richard W. Broockman and David M. Jones, (2) plaintiffs' negligent misrepresentation claims against all the individual defendants except Broockman and Jones, (3) plaintiffs' civil conspiracy claims, and (4) plaintiffs' tortious inference with contract claims against defendants R.D. Kennedy and Ralph Lutjen. Plaintiffs have filed a timely response to these objections.

Pursuant to Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b), I have reviewed *de novo* those aspects of the Report to which defendants object. I find that defendants' objections are adequately addressed by the Report. I hereby accept and adopt the Report, attached hereto, in its entirety. For the reasons stated in the Report, I grant defendants' motion to dismiss in part and deny it in part. Specifically, I:(1) dismiss plaintiffs' state statutory claims brought pursuant to the Texas Deceptive Trade Practices Act, the Connecticut Unfair Trade Practices Act, and the California Franchise Investment Law; (2) dismiss all claims against defendant Union Carbide Corporation ("UCC"); (3) dismiss all claims for tortious interference with prospective business relations; (4) limit the remedy for breach of warranty claims against defendants Union Carbide Marble Care ("UCMC") and Union Carbide Chemicals and Plastics Company, Inc. ("UCC&P") to the replacement or purchase price of the warrantied goods. Defendants' motion to dismiss is denied in all other respects.

SO ORDERED.

## REPORT AND RECOMMENDATION

KATZ, United States Magistrate Judge.

This action was referred to me pursuant to your Order of Reference, for general pretrial supervision and the resolution of dispositive motions requiring a Report and Recommendation. Plaintiffs are five individuals and the five corporate franchises in which they hold stock and which were formed pursuant to agreements entered into with defendant Un-

ion Carbide Marble Care, Inc. ("UCMC"). Defendants are UCMC, Union Carbide Chemicals and Plastics Company Inc. ("UCC&P"), parent and owner of ninety-two percent of the stock of UCMC, Union Carbide Corporation ("UCC"), parent and owner of UCC&P, and a number of individuals who are current or former directors, officers or employees of the three corporate defendants.[1] Plaintiffs assert numerous claims against defendants in connection with their franchise agreements with UCMC, alleging, *inter alia,* breach of contract and warranty, a number of tort claims alleging negligent and fraudulent behavior, and violations of a number of state statutes. Currently before the Court is defendants' motion to dismiss in part the Amended Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court heard oral argument on the motion on February 5, 1997. For the reasons that follow, I recommend that the motion be granted in part and denied in part.

### BACKGROUND

Between May, 1990 and August, 1991, each of the individual plaintiffs entered into franchise agreements with UCMC. (Plaintiff's Amended Complaint, dated August 14, 1996 ("Am.Compl."), at ¶¶ 36, 44, 51, 57, 68.) In essence, in exchange for certain payments, the agreements granted each of the franchisees the right to operate one "Marblelife" business in a specifically defined territory.

The Amended complaint sets forth in detail the background of the Marblelife enterprise, but a short synopsis will suffice for present purposes. In the late 1980s, UCC implemented the "Intrepeneurship" program, designed to foster new business ventures within Union Carbide. (Am.Compl. at ¶ 19.) As part of this program, UCC&P undertook an effort to exploit the market for marble care chemicals by providing a marble care service offering uniform chemicals, techniques and results. (Am.Compl. at ¶¶ 19–21.) The project was spearheaded by defendant Richard Broockman ("Broockman"), who later became President of UCMC, and a team

from UCC&P, who set about developing a business plan for the implementation of a nationwide franchise system of marble care specialists. (*Id.* at ¶¶ 205–25.) In an effort to gain knowledge and experience in the marble care industry, UCC&P acquired an existing marble care company, which then became its subsidiary, UCMC. (*Id.* at ¶¶ 23, 28.) The new venture was coined "Marblelife." (*Id.* at ¶ 29.)

As a result of advertisements and other solicitations placed by UCMC, each of the individual plaintiffs inquired about, and eventually acquired, a Marblelife franchise. (*See Id.* at ¶¶ 31, 38, 46, 54, 63.) The individual plaintiffs allege that prior to entering into the franchise agreements, defendants Broockman and David M. Jones ("Jones"), Vice President of UCMC, made material misrepresentations about the Marblelife system, the chemicals used in the system and the right under the franchise agreement to use by the franchisees of the Union Carbide name and trademark, (*Id.* at ¶¶ 34, 40, 48, 55, 66), all of which they allege induced them into entering into the agreements. Plaintiffs further allege that they were induced to continue making purchases of chemicals and equipment under their franchise agreements because they were repeatedly, and falsely, assured by Broockman and defendant Reed Freeman ("Freeman") that UCC&P was not seeking a buyer for UCMC. (*Id.* at ¶¶ 70–73.)

On October 27, 1995, plaintiffs commenced this action by filing two lawsuits in the Texas state courts, each of which was against some of the defendants named in the Amended Complaint. Those actions were removed by the defendants to the United States District Court for the Southern District of Texas (Houston Division) based on diversity jurisdiction. That court denied the plaintiffs' motion to remand the cases to state court and the motion of the defendants to dismiss based on the forum selection clause in the franchise agreements. (*See* Consolidation and Transfer Order, dated April 1, 1996.) The court then transferred the two actions to

1. Plaintiffs' motion to discontinue this action without prejudice with respect to defendant Michael Neary was granted on November 11, 1996.

Neary is, therefore, no longer a party to this action.

the Southern District of New York "pursuant to the franchise agreements' forum selection clause." (Id.) In June, 1996, defendants moved to dismiss the Complaints, but later agreed to withdraw that motion to afford plaintiffs the opportunity to file an amended complaint in order to cure the deficiencies in the original Complaints. After the actions were consolidated for all pretrial purposes (See Order, dated October 1, 1996), plaintiffs filed their Amended Complaint. Read liberally, the Amended Complaint appears to allege as to all defendants the following causes of action: violations of the California Franchise Investment Law, the Massachusetts Regulation of Business Practices for Consumer Protection Law, the Connecticut Unfair Trade Practices Law and the Texas Deceptive Trade Practices Act (collectively, "the state statutory claims")[2]; fraudulent misrepresentation; fraudulent omissions; breach of warranty; civil conspiracy; and negligence. As to UCMC, UCC and UCC&P only, the Amended Complaint also alleges breach of contract and, as to UCC, UCC&P and individual defendants Ralph Lutjen and R.D. Kennedy only, the Amended Complaint additionally alleges tortious interference with contract and tortious interference with prospective business relations. Liability of UCC and UCC&P for the breaches of contract appears to hinge on the theory that UCMC was the alter ego of its corporate parent and grandparent. (Am.Compl. at ¶ 110.) Plaintiffs seek an undisclosed sum in damages, attorneys fees, costs and interest. Defendants move to dismiss all of the claims as to all defendants with the exceptions, as to UCMC only, of the breach of contract claim and, as limited under the terms of the franchise agreements, the breach of warranty claims.

## DISCUSSION

### I. Motion to Dismiss Under Rule 12(b)(6)

In deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Proce-

dure, the Court must construe the allegations of the complaint in the plaintiff's favor. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). See also PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1197 (2d Cir.1996); Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); Dahlberg v. Becker, 748 F.2d 85, 88 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). The Court must draw all reasonable inferences in plaintiffs' favor and may dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); Walker v. City of New York, 974 F.2d 293, 298 (2d Cir.1992), cert. denied, 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993); Fields v. Soloff, 920 F.2d 1114, 1118–19 (2d Cir.1990). All pleadings should be construed so as to do substantial justice. Fed.R.Civ.P. 8(f). The Court should not weigh evidence that might be presented at trial but, instead, it should merely determine whether the complaint itself is legally sufficient. Culver v. Merrill Lynch & Co., No. 94 Civ. 8124(LBS), 1995 WL 422203, at * 2 (S.D.N.Y. July 17, 1995); see also Festa v. Local 3 Int'l Brotherhood of Elec. Workers, 905 F.2d 35, 37 (2d Cir.1990).

Among the items that may be considered on a motion to dismiss are documents incorporated into the complaint by reference, documents attached to the complaint as exhibits, information that can be judicially noticed, or " 'documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.' " Culver, 1995 WL 422203 at * 2 (quoting Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993)); Curti v. Girocredit Bank, No. 93 Civ. 1782(PKL), 1994 WL 48835, at * 1 (S.D.N.Y. Feb.14, 1994). Therefore, on this motion to dismiss, the Court may properly consider the parties' franchise agreements and the purchase agreements, both of which

---

**2.** Plaintiffs have agreed to dismiss their claims brought under the New York State Franchise Sales Act. (Memorandum of Law in Support of Plaintiffs' Response to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, undated ("Pl.Br."), at 3; see also Transcript of Oral Argument, dated February 5, 1997 ("Hearing Tr."), at 42.)

are integral to the allegations contained in the Amended Complaint and both of which are referenced in the Amended Complaint and in plaintiffs' brief submitted in opposition to this motion.[3] Additionally, the documents attached to the affidavit of plaintiffs' counsel, Daniel Gildin, which were submitted with defendants' motion papers, may also be considered, since they were in plaintiffs' possession when the Amended Complaint was filed. *See, e.g., Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint, the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *accord International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995).

## II. Choice of Law

As a threshold matter, this Court, sitting in diversity, must determine what state's substantive law is to be applied to plaintiffs' claims. Plaintiffs argue that Texas law applies to all of the claims. Defendants argue that New York law applies to all of the claims. It is my conclusion that New York law applies to the breach of contract claims and that the tort claims, as categorized below, are governed by Texas, Ohio and California law.[4]

Generally, in diversity cases, a federal court applies the substantive law of the state in which the court sits, including that state's choice of law rules. *See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Valley Juice Ltd. v. Evian Waters of France, Inc.,* 87 F.3d 604, 607 (2d Cir.1996).

However, when a case is transferred from one federal jurisdiction to another, by either a plaintiff or a defendant, the law applicable subsequent to transfer depends on whether the transfer was made pursuant to 28 U.S.C. § 1406(a), because venue was improper and could not have been maintained in the transferor court, or pursuant to 28 U.S.C. § 1404(a), for the convenience of the parties. *Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.,* 855 F.Supp. 627, 629 (S.D.N.Y. 1994); *Jordache Enters., Inc. v. Brobeck, Phleger & Harrison,* No. 92 Civ. 9002(KMW), 1994 WL 74860, at *2 (S.D.N.Y. Mar.7, 1994). If the transfer was made pursuant to § 1406(a), the transferee states law, including its choice of law rules, is applicable. *Emjayco v. Morgan Stanley & Co.,* No. 95 Civ. 8546(DLC), 1996 WL 452266, at *4 (S.D.N.Y. Aug.8, 1996); *Coraggio v. Time Inc. Magazine Co.,* No. 94 Civ. 5429(MBM), 1995 WL 242047, at * 3 (S.D.N.Y. Apr.26, 1995); *Caribbean Wholesales,* 855 F.Supp. at 629; *Jordache,* 1994 WL 74860, at *2. If, however, the transfer was pursuant to § 1404(a), the transferor jurisdiction's substantive law, including its choice of law rules, are to be applied by the transferee court. *Ferens v. John Deere Co.,* 494 U.S. 516, 519, 110 S.Ct. 1274, 1277, 108 L.Ed.2d 443 (1990); *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 32, 108 S.Ct. 2239, 2245, 101 L.Ed.2d 22 (1988); *Valley Juice,* 87 F.3d at 607; *Caribbean Wholesales,* 855 F.Supp. at 629; *Jordache,* 1994 WL 74860, at *2.

Here, the transfer order of the Texas District Court does not cite either § 1404(a) or § 1406(a) in support of the transfer. However, the order unambiguously states that the transfer was made "pursuant to the franchise agreements' forum selection clause."[5] Transfers made pursuant to forum

---

3. At oral argument, the parties specifically consented to the Court's consideration of the franchise and purchase agreements in deciding this motion, without converting it to a motion for summary judgment. (Hearing Tr. at 8–9.)

4. The claim brought by plaintiff Ellen Lynch ("Lynch") pursuant to the Massachusetts Consumer Protection Act, which I find *infra* survives this motion to dismiss, is, of course, governed by that statute and case law construing the statute.

5. The forum selection clause in the franchise agreement states that "[a]ny litigation arising out of or relating to this Agreement, or any breach thereof, shall be instituted in a court of competent jurisdiction in New York, New York." (Union Carbide Marble Care, Inc. Unit Franchise Agreement, attached to Affidavit of Daniel Gildin as Exhibit A ("Franchise Agreement"), at ¶ 30.02.)

selection clauses have consistently been construed as falling under the rubric of § 1404(a). *See, e.g., Stewart,* 487 U.S. at 31–32, 108 S.Ct. at 2245 (transfer made pursuant to a forum selection clause is controlled by § 1404(a)); *Huntingdon Eng'g & Envtl., Inc. v. Platinum Software Corp.,* 882 F.Supp. 54, 56 (W.D.N.Y.1995) (where venue is otherwise proper, forum selection clause is not grounds for dismissal for improper venue under § 1406(a); rather, court will apply § 1404(a) to determine propriety of transfer); *Caribbean Wholesales,* 855 F.Supp. at 630 (motion to transfer premised on forum selection clause is decided under 5 1404(a) and not under § 1406(a)) (citing *Stewart,* 487 U.S. at 28, 108 S.Ct. at 2243); *see also TUC Elecs., Inc. v. Eagle Telephonics, Inc.,* 698 F.Supp. 35, 38 (D.Conn.1988) (where federal venue statute lays venue in a particular district, forum selection clause providing to the contrary does not make that district improper within the meaning of § 1406(a)); *Heyco, Inc. v. Heyman,* 636 F.Supp. 1545, 1547 (S.D.N.Y.1986) (same). Therefore, since this action was transferred on the basis of a forum selection clause, not on the basis of improper venue, it is to be viewed as a transfer under § 1404(a), for the convenience of the parties,[6] and the choice of law rules of Texas, as the transferor state and the state in which the action was filed, determine the substantive law to be applied to the claims.

The Franchise Agreement contains a New York choice of law provision and plaintiffs allege claims sounding in both contract and in tort. Therefore, the first step in resolving what substantive law is to be applied is to determine both the validity and the scope of the choice of law provision under Texas choice of law principles. That is, in order to discern the proper law to apply, the Court must first determine whether Texas would honor the parties' choice of New York law as set forth in the Franchise Agreement, and if Texas would interpret that provision in the Agreement as governing the tort as well as the contract claims. I find that Texas would enforce the choice of law clause and that,

therefore, New York law governs all of plaintiffs' contract claims. However, particularly in light of the narrow language contained in the choice of New York law clause, I find that Texas would construe that clause as governing only plaintiffs' contract claims and not the tort claims. Therefore, with respect to plaintiffs' tort claims, Texas choice of law analysis governing tort claims will be applied.

■ As a means of protecting the justified expectations of the parties, Texas choice of law principles generally give effect to choice of law clauses in contracts. *Salazar v. Coastal Corp.,* 928 S.W.2d 162, 166 (Tex.App.1996); *Chase Manhattan Bank v. Greenbriar North Section II,* 835 S.W.2d 720, 723 (Tex.App. 1992); *State Nat.'l Bank v. Academia, Inc.,* 802 S.W.2d 282, 289 (Tex.App.1990); *Caton v. Leach Corp.,* 896 F.2d 939, 942 (5th Cir. 1990) (construing Texas choice of law). Texas has adopted Section 187 of the Restatement (Second) of Conflict of Laws concerning contractual choice of law provisions. Under that approach, a court will apply the law of the state chosen by the parties if the particular issue being litigated "is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." *Salazar,* 928 S.W.2d at 166 (quoting *Restatement (Second) of Conflict of Laws* § 187(1)). Moreover, even if the issue is one which the parties could not have determined by means of an explicit contract provision, courts in Texas will only refuse to honor the express wishes of the parties as to what law will control their contract disputes if the chosen law (1) bears no reasonable relationship to either the parties or the subject matter of the agreement, or (2) the chosen law would offend a fundamental public policy of a state whose laws otherwise would apply. *Salazar,* 928 S.W.2d at 166; *Chase Manhattan,* 835 S.W.2d at 723; *Academia,* 802 S.W.2d at 289; *Caton,* 896 F.2d at 942.

■ Here, the parties not only could have resolved through express provisions the issues now being litigated—the rights and duties of the parties under the contract and

---

**6.** The brief filed in support of the motion to transfer did not contend that venue was improper in Texas under 28 U.S.C. § 1391 and that the court should have therefore dismissed the case

under § 1406. Rather, defendants relied wholly on the forum selection clause and the convenience of the parties and witnesses in arguing that the case should be transferred to New York.

UCMC's obligations in the event of a sale of the company—they most assuredly did so. Therefore, under Texas choice of law rules, the parties' choice of New York law will be honored. *See Salazar,* 928 S.W.2d at 167. Moreover, even assuming that the issues could not have been resolved through an express provision, Texas courts would still honor the parties' choice of law.

■ Plaintiffs do not argue that a fundamental public policy of another state would be violated by enforcement of the choice of law provision. Rather, they contend that Texas would not honor the choice of law clause in the Franchise Agreement because New York lacks a reasonable relationship to either the parties or the Franchise Agreements. I disagree. As defendants point out, UCMC, one of the parties to all of the Franchise Agreements, operates a training facility in Tarrytown, New York for franchisees, and additionally, it has a number of franchises in New York. (Def. Reply Mem. at 5.) Moreover, two of those franchisees were employed by UCMC as management consultants. (*Id.*) Finally, plaintiff Jerry Maltz ("Maltz") claims that he twice met with UCMC employees in New York and that the misrepresentations at issue in this action were made to him during one of those meetings (Am.Compl. at ¶ 35), and plaintiff Nick Began ("Began") claims he met with UCMC employees in New York prior to signing his agreement. (Am.Compl. at ¶ 57.) At that meeting, representatives of UCMC purported to arrange a demonstration of the Marblelife system. In fact, according to the Amended Complaint, Began was misled by UCMC at that meeting, since the system employed during the demonstration was not the Marblelife system.

■ Plaintiffs do not dispute these contacts between New York and the parties to the Franchise Agreements, some of which touch on the very subject matter of the Amended Complaint. Rather, they argue

that Texas courts will only find a reasonable relationship where the state whose law was chosen by the parties is the principle place of business of at least one of the parties. (Pl. Br. at 6–8.) However, a fair reading of the cases cited by plaintiffs does not support this proposition. While Texas courts will find a reasonable relationship where one of the parties has its principle place of business in the chosen state, none of the cases suggest that this is a prerequisite for honoring a choice of law clause.[7] *See Salazar,* 928 S.W.2d at 166–67; *Chase Manhattan Bank,* 835 S.W.2d at 723–25; *First Commerce Realty Investors v. K–F Land Co.,* 617 S.W.2d 806, 808–09 (Tex. Civ.App.—Houston [14th Dist.] 1981).

■ Under Texas law, however, the choice of law clause in the agreements governs only the contract claims and not plaintiffs' tort claims. Texas courts look to the language of a choice of law clause to determine its scope, and unless that language indicates that the parties intend its scope to be broader than claims sounding in contract, it will be deemed to govern only contract claims. *See Busse v. Pacific Cattle Feeding Fund # 1, Ltd.,* 896 S.W.2d 807, 812–13 (Tex.App.1995) (where language in choice of law clause states that "agreement and the rights and obligations of the parties arising hereto shall be construed in accordance with" the laws of a certain state, claims of misrepresentation and fraud in the inducement, which preceded execution of contract and did not deal with terms of contract, are not covered by clause); *Thompson and Wallace of Memphis, Inc. v. Falconwood Corp.,* 100 F.3d 429, 432–33 (5th Cir. 1996) (where choice of law provisions apply to "agreement ... and enforcement" of contract, tort causes of action are not governed by provisions) (citing *Busse*); *Caton,* 896 F.2d at 943 (narrow language such as "[t]his Agreement shall be construed under the laws [of a certain state]" does not govern tort claims, while broad language such as "gov-

---

**7.** Moreover, strong public policy reasons support honoring choice of law clauses in franchise agreements where the franchiser has entered into a number of such agreements in various states, as is true in this case. *See Capital Nat'l Bank of New York v. McDonald's Corp.,* 625 F.Supp. 874, 880 (S.D.N.Y.1986). The parties' choice of law provides the benefit of certainty as to what substantive law will be applied, and simplicity in multi-party litigation where potential parties are domiciled in different states throughout the country. In such cases, the interest of an individual plaintiff, such as Maltz, in having the law of his home state apply, cannot be said to outweigh these benefits.

ern, construe and enforce the rights and duties of the parties arising from or relating in any way to the subject matter of this contract" would cover all claims, including tort claims, related to the contract).

The choice of law clause in the Franchise Agreement states, in pertinent part, that the *"Agreement is to be construed in accordance with the law of the State of New York* without recourse to New York choice of law or conflicts of law principles." (Franchise Agreement at ¶ 29.01) (emphasis added). Applying the principles in the cases cited above, it is clear that this language does not encompass the tort claims in the Amended Complaint. Therefore, Texas choice of law principles must be applied to determine the substantive law governing those claims.[8]

■ Where, as here, the parties have not agreed to the application of a particular state's law with respect to their tort causes of action, Texas will scrutinize the contacts between the parties and the occurrences that are material to the parties' dispute to determine which state has "the most significant relationship to the particular substantive issue," and will apply the law of that state to resolve that issue. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984); *accord Caton,* 896 F.2d at 943; *Thompson,* 100 F.3d at 433; *Gutierrez v. Collins,* 583 S.W.2d 312, 319 (Tex.1979). In implementing that test, Texas courts consider the four factors enumerated in section 145 of the Restatement (Second) of Conflict of Laws: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Duncan,* 665 S.W.2d at 421; *Gutierrez,* 583 S.W.2d at 319; *Parra v. Larchmont Farms, Inc.,* 932 S.W.2d 68, 73–

74 (Tex.App.1995), *rev'd on other grounds,* 941 S.W.2d 93 (Tex.1997); *Academia,* 802 S.W.2d at 290. The outcome of the test does not turn merely on the number of contacts that any given state has to the case, but rather on the qualitative nature of those contacts, which itself is determined on a case-by-case basis by balancing each contact against the other contacts. *See, e.g., Academia,* 802 S.W.2d at 290–91 (citing *Duncan,* 665 S.W.2d at 421); *Gutierrez,* 583 S.W.2d at 319.

■ Applying these factors to the tort claims at issue, it is clear that the law of a single state cannot be applied to all the claims, as suggested by the parties. Moreover, factors one and three tip the scales decidedly in favor of applying Texas law to the claims of Maltz and his franchise Marblecare of Houston, applying Ohio law to the claims of Began and his franchise Stoneworks, Ltd., Inc., and applying California law to the claims of the remaining individual plaintiffs and their franchises, Doug Selik ("Selik") and Marblelife of San Diego, Lynch and Marblelife of South Orange Co. and Joseph Hackett ("Hackett") and Marblelife of Palm Springs.

With respect to the first factor, the injuries purportedly suffered by the plaintiffs were sustained at the location of their respective franchises, which in all cases is the same state as that in which they reside. Thus, Maltz, who is domiciled in Texas, also suffered his injuries in the state of Texas, where his franchise is located. Likewise, Began, who is a resident of Ohio, suffered his injuries in the state of Ohio, where his franchise is located. Selik, Lynch and Hackett, all of whom are residents of California, the same state as the situs of their franchises, suffered their injuries in California. Moreover, due to its contractual relationships with the plaintiffs and its duties under the Fran-

---

8. Defendants appear to argue that courts broadly interpret choice of law provisions in franchise agreements to govern tort as well as contract claims. *See* Def.Br. at 8 & n. 3; Def. Reply Br. at 6–7. However, the cases cited by defendants do not support this proposition. Indeed, those courts apply a similar analysis, albeit in reaching a different conclusion, as does this Court—looking to the language of the choice of law clause to determine its scope. Moreover, none of these cases apply Texas law and they therefore do not aid in determining how the choice of law clause at issue should be construed under Texas law. Defendants provide no support for their conclusion that convenience and expediency may override choice of law principles in determining the proper law to be applied in any given case, and this Court too has been unable to locate any such authority.

chise Agreements, UCMC was apparently doing business in all of these states. Finally, other relevant contacts point to plaintiffs' home states as having the most significant relationship to the parties' tort disputes. For example, all of the individual plaintiffs claim that they met with UCMC officials at least once in their respective home states about the prospect of entering into the Franchise Agreements, and Maltz, Began and Selik specifically allege that the very misrepresentations at issue in this litigation were made to them, respectively, in Texas, Ohio and California. (Am.Compl. at ¶¶ 34, 56.) Although there are a number of other states having contact with the tort causes of action, no other state has a more significant relationship, in qualitative terms, to the parties or the occurrences than do Texas, Ohio and California. For example, the defendants reside in and are incorporated in a number of different states, including Delaware, New York, Colorado and Connecticut. Although the Amended Complaint does allege that some conduct related to the torts occurred in some of those states,[9] no plaintiff is alleged to have been injured in those states and the contact relevant to the causes of action occurring in those states was both sporadic and in certain states, was limited to only some of the plaintiffs. That conduct was not as significant as that which occurred in Texas, Ohio and California with respect to each of the plaintiffs whose franchises were located in those states.

Thus, Texas choice of law principles dictate that New York law will be applied to the contractual claims in accordance with the choice of law provision in the Franchise Agreements. Texas law will be applied to the tort claims of Maltz, Ohio law will be applied to the tort claims of Began, and California law will be applied to the tort claims of Selik, Lynch and Hackett, as these states have the most significant relationships to those parties and their tort claims.

### III. Liability for Breach of Contract and Breach of Warranty

Plaintiffs allege that their Franchise Agreements were breached when UCMC failed to deliver the products and services it had agreed to deliver under the Agreements, and when the UCMC Marblelife system was eventually sold to a financially unsound buyer, who was unable to perform the terms of their contracts with UCMC. (Hearing Tr. at 4–5; see also Am.Compl. at ¶¶ 101–02.)[10] Plaintiffs also allege breach of both implied and express warranties, contending that defendants falsely represented that the chemicals used in the Marblelife system were safe and appropriate for use in cleaning marble surfaces. (Am.Compl. at ¶¶ 103–104.) Defendants seek to dismiss the breach of contract and breach of warranty claims as to UCC and UCC&P only, and additionally seek to limit any remedy that plaintiffs may recover against UCMC for breach of warranty to that provided for under the contract.

For the reasons that follow, I find that plaintiffs have sufficiently pleaded an alter ego theory of liability so as to hold UCC&P liable for UCMC's breaches of contract, but that the Amended complaint fails to state a claim under this theory against UCC. I further find that any recovery against UCMC or UCC&P for breach of warranty for defects in the chemicals or other goods supplied pursuant to the Purchase and Franchise Agreements is limited to the exclusive remedy agreed to by the parties, as embodied in those documents.

### A. Liability of UCC & UCC&P for UCMC's Breaches

Plaintiffs seek to "pierce the corporate veil" to hold UCC and UCC&P (the corpo-

---

9. For example, Maltz claims that he met with UCMC employees in New York, at which time the misrepresentations first made in Texas were repeated to him (Am.Compl. at ¶ 35); Began claims he attended a bogus demonstration of the Marblelife system in New York (Am.Compl. at ¶ 57); and Lynch claims that she attended a Marblelife meeting in Connecticut. (Am.Compl. at ¶ 49.)

10. Some time in early 1993, Marblelife was sold to Ed Williams, who owned a Marblelife franchise. Plaintiffs claim that the sale to Williams breached § 18.01 of the Franchise Agreement which required that any sale must be made to a "financially responsible and economically capable" party who could perform the obligations of the franchisor under the Franchise Agreements.

rate grandparent and parent of UCMC), non-parties to their contracts, liable for UCMC's alleged breaches, on the theory that UCMC was merely an alter ego of UCC and UCC&P and was actually doing the business of those entities. (See Am.Compl. at ¶ 110.)[11] Defendants, on the other hand, argue that plaintiffs have failed to allege facts sufficient to support liability under an alter ego theory. For the reasons that follow, I find that the Amended Complaint is sufficient at this juncture to sustain the alter ego theory of liability as against UCC&P, but not against UCC.[12]

As an initial matter, I note that the allegations in the Amended Complaint are painted in extremely broad-brush strokes. Throughout, the word "defendants" is used indiscriminately, with no attempt made to identify the particular defendant to which a specific allegation refers, or, in some oases, to link particular defendants with the acts alleged. With respect to the individual defendants, potential liability for any given cause of action may be evident, because they are alleged to have performed at least some specific acts. However, with respect to corporate defendants UCC and UCC&P, although the Amended Complaint broadly asserts "alter ego" as the basis of liability against them, it is not at all clear for which specific claims

plaintiffs seek to assert such liability. For instance, although plaintiffs use the word "defendants" in the breach of warranty section of the Amended Complaint, indicating that they seek to hold all defendants liable for that claim, inexplicably, they appear to limit the breach of contract claim to UCMC and UCC&P, while at the same time alleging alter ego liability against UCC. Under the circumstances, I construe the Amended Complaint to assert alter ego liability against UCC and UCC&P for UCMC's breaches of contract, including breaches of the warranty provisions of the Franchise Agreements. Neither UCC nor UCC&P is a party to the Franchise Agreements and they therefore could not be held liable for breaches in the absence of alter ego liability.[13]

Generally, parent and subsidiary corporations are treated as separate legal entities, and a contract by one does not legally bind the other. See Carte Blanche (Singapore), Pte, Ltd. v. Diners Club Int'l, 2 F.3d 24, 26 (2d Cir.1993); Gmerek v. Scrivner, Inc., 221 A.D.2d 991, 992, 634 N.Y.S.2d 299, 299 (4th Dep't 1995) ("As a general rule, a parent corporation is not liable for the acts of a subsidiary.") (citations omitted). Courts in New York are reluctant to disregard the distinction between corporate entities. Carte

**11.** The Amended Complaint obviously contains a typographical error in its assertion that UCMC was acting "solely as a conduit for the performance of UCMC's business," and I therefore read it as actually stating that UCMC was acting as a conduit for UCC and UCC&P's business. Defendants appear to read the Amended Complaint as the Court does, as evidenced by their arguments in support of their motion to dismiss these claims as to UCC and UCC&P.

**12.** I reach this conclusion having applied New York alter ego law, as requested by the defendant, because New York is the state of incorporation of both UCC and UCC&P. See Kalb, Voorhis & Co. v. American Fin. Corp., 8 F.3d 130, 132 (2d Cir.1993) ("Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away.") (citation omitted); see also Restatement (Second) of Conflicts § 307 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability ... for corporate debts."). However, the resolution of this choice of law question is somewhat academic, as my

review of Texas alter ego doctrine convinces me that application of Texas law, as requested by plaintiffs, would lead to the same result as application of New York law. See generally Mancorp. Inc. v. Culpepper, 802 S.W.2d 226, 228 (Tex. 1990) (discussing factors that may establish alter ego relationship); Castleberry v. Branscum, 721 S.W.2d 270, 275 (Tex.1986) (same); Salazar, 928 S.W.2d at 170.

**13.** With respect to the other claims in the Amended Complaint, I note that individuals from UCC&P are alleged to have directly participated in the conduct at issue. Therefore, UCC&P's liability, if any, for that tortious conduct, would be predicated on respondeat superior. As to UCC, as is discussed more fully infra, there is simply no basis asserted that would support alter ego liability for any of the claims in the Amended Complaint. Moreover, no individual from UCC is alleged to have committed any tortious act, and it therefore cannot be liable on a theory of respondeat superior. Plainly, no theory of liability is sufficiently asserted against UCC, and all claims against it must therefore be dismissed.

*Blanche,* 2 F.3d at 26 (citation omitted). In New York, the party seeking to hold a parent liable for a subsidiary's breach of contract bears the burden of establishing both that the parent corporation "exercised complete domination of [the subsidiary] corporation in respect to the transaction attacked; and ... that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." *Morris v. New York State Dep't of Taxation and Fin.,* 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810–11, 623 N.E.2d 1157 (1993); *accord. e.g., Mass v. McClenahan,* 893 F.Supp. 225, 233 (S.D.N.Y. 1995); *Weinreich v. Sandhaus,* 850 F.Supp. 1169, 1178 (S.D.N.Y.1994); *Letizia v. Executive Coach Auto Repair, Ltd.,* 213 A.D.2d 382, 382, 623 N.Y.S.2d 327, 328 (2d Dep't 1995); *Hyland Meat Co. v. Tsagarakis,* 202 A.D.2d 552, 552, 609 N.Y.S.2d 625, 626 (2d Dep't 1994); *see also Warnaco Inc. v. VF Corp.,* 844 F.Supp. 940, 946 (S.D.N.Y.1994) ("a parent company may be liable on a contract signed by its subsidiary if the subsidiary is shown to be a mere shell dominated and controlled by the parent for the parent's own purposes") (citing *In re Sbarro Holding, Inc. .,* 91 A.D.2d 613, 456 N.Y.S.2d 416 (2d Dep't 1982)). A party need not show that a parent's domination of its subsidiary was "complete as to every detail," but rather, it need only adequately allege that domination was "complete in respect to the transaction attacked." *Directors Guild of Am., Inc. v. Garrison Productions, Inc.,* 733 F.Supp. 755, 761 (S.D.N.Y.1990) (citing *Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847, 853 (2d Cir. 1985)) (applying New York law); *accord Apex Oil Co. v. DiMauro,* 713 F.Supp. 587, 611 (S.D.N.Y.1989) (control must be established only as to the transaction attacked so that, as to that transaction, the entity had no separate mind).

▄ Courts in this state, and federal courts construing New York law, have identified certain factors relevant to determining whether a parent controls a subsidiary corporation to a sufficient degree to be considered its "alter ego." Among those factors are (1) the absence of formalities of corporate existence on the part of the subsidiary; (2) an overlap in ownership, officers, directors and personnel between the two corporations; and

(3) the amount of business discretion displayed by the subsidiary. *Carte Blanche,* 2 F.3d at 26 (citing *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 139 (2d Cir.1991)); *Weinreich,* 850 F.Supp. at 1178; *see also Austin Powder Co. v. McCullough,* 216 A.D.2d 825, 826–27, 628 N.Y.S.2d 855, 856–7 (3d Dep't 1995); *107 Realty Corp. v. National Petroleum U.S.A. Ltd.,* 181 A.D.2d 817, 818, 581 N.Y.S.2d 375, 376 (2d Dep't 1992); *888 7th Ave. Associates Ltd. Partnership v. Arlen Corp.,* 172 A.D.2d 445, 445–46, 569 N.Y.S.2d 16, 17 (1st Dep't 1991). Although the concept of "complete domination and control" is malleable and open to differing interpretations, depending on the particular factual matrix at issue, one certainty is that "liability can never be predicated solely upon the fact of a parent corporation's ownership of a controlling interest in the shares of a subsidiary. At the very least, there must be direct intervention by the parent in the management of the subsidiary to such an extent that the subsidiary's paraphernalia of incorporation, directors, and officers are completely ignored." *Billy v. Consolidated Mach. Tool Corp.,* 51 N.Y.2d 152, 163, 432 N.Y.S.2d 879, 886, 412 N.E.2d 934 (1980) (citation omitted).

▄ Even accepting as true all of the factual allegations in the Amended Complaint, which I must for purposes of this motion, plaintiffs have failed to satisfy the first part of the *Morris* two-part test with respect to UCC. The Amended Complaint baldly asserts, in a single four-line paragraph, that "UCMC is but the alter ego of UCC&P and UCC, acting solely as a conduit for the performance of [their] business, and resulting in actual fraud." (Am.Compl. at ¶ 110.) While plaintiffs have stated the correct legal standard for determining alter ego liability under New York law, they fail to allege any facts which, if true, would indicate that UCC exercised any control over UCMC, much less a degree of control in its ongoing relationship with the franchisees as to render UCMC a mere shell or dummy corporation, operating at the behest of and solely for the benefit of UCC, so as to justify piercing the corporate veil to hold UCC liable for UCMC's breaches of contract. *See, e.g., Zi-*

*naman v. USTS New York, Inc.*, 798 F.Supp. 128, 132 (S.D.N.Y.1992) (dismissing alter ego claims where complaint failed to allege control and domination to a degree that company had no existence of its own) (applying New York law); *Klockner Stadler Hurter Ltd. v. The Ins. Co. of the State of Pennsylvania*, 785 F.Supp. 1130, 1136 (S.D.N.Y.1990) (same); *People of the State of Illinois ex rel. Washburn v. Frank B. Hall & Co., Inc.*, 174 A.D.2d 562, 572 N.Y.S.2d 646 (2d Dep't 1991); *Metropolitan Transp. Auth. v. Triumph Adver. Prods., Inc.*, 116 A.D.2d 526, 497 N.Y.S.2d 673 (1st Dep't 1986).

Plaintiffs, in their brief in opposition, do not even attempt to point to factual allegations in the body of the Amended Complaint that would support their theory of liability against UCC applying these criteria. Indeed, read in the most generous light, as to UCC, the allegations merely establish that certain of the individual defendants who became officers, directors and employees of UCMC were at one time employees of UCC, that UCC may have taken steps to exploit the market for their chemicals by encouraging the establishment of ventures that would involve the sale of such chemicals, and that UCC held a controlling interest in UCC&P, the company that would eventually establish UCMC. Indeed, there is no allegation that any individual from UCC was in any way involved in the formation and operation of UCMC. Plaintiffs do not even allege that the individual defendants were employees, officers or directors of UCC at the same time they were employed by UCMC, and even if they had, such an allegation, by itself, would not suffice for purposes of pleading alter ego liability. *See American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir.1988) (existence of interlocking directorates between a parent and a subsidiary is a "commonplace circumstance of modern business [that] does not furnish such proof of control as will permit a court to pierce the corporate veil"), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *Pits*, 911 F.Supp. at 715 (same); 1 William Meade Fletcher, et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 41.30, at 664 (1990 rev. ed.) (decision to pierce corporate veil may not rest on a single factor). Nor do they allege that the financial structure or bookkeeping practices of UCMC were intertwined with those of UCC. In short, these bare allegations, even if true, cannot establish a basis for piercing the corporate veil.

Rather than making particularized allegations, plaintiffs attempt to meet their pleading burden by pointing to numerous documents attached to the Amended Complaint. However, none of those documents suggest control and domination of UCMC by UCC. Indeed, the only thing that the documents suggest that UCC and UCMC shared was the "Union Carbide" name affiliation.[14] Moreover, there is barely a mention in the documents of any officer or director of UCC, and simply no indication that UCC was acting in a way that would indicate domination and control by UCC of UCMC. Taken as a whole, the documents evidence nothing more than the establishment, by UCC&P, of a subsidiary that was expected to exploit the market for chemicals, presumably to the ultimate advantage of UCC and UCC&P, and that the subsidiary company was staffed with former employees of UCC and UCC&P. Plaintiffs do not contend, nor could they, that the mere establishment of a subsidiary, for the purpose of financial gain, in and of itself establishes "control" or "domination" on the part of the parent or grandparent. In short, despite their volume, none of the documents attached to the Amended Complaint support plaintiffs' assertion that UCC dominated and controlled UCMC.[15]

**14.** Indeed, plaintiffs appear to rely heavily on the Union Carbide name association to establish a connection between UCC and UCMC. They highlight in each exhibit the words "Union Carbide" in the name "Union Carbide Marble Care, Inc." as if it had some independent relevance in demonstrating a relationship of domination and control by UCC over UCMC. However, there is no issue over whether the two companies shared a part of each other's names, nor does that fact, by itself, carry any weight in determining whether UCMC was UCC's alter ego.

**15.** Plaintiff has now had two opportunities to redraft the Complaint to properly allege a theory of alter ego liability as to UCC. No further amendments will be entertained unless new facts, presently unavailable, are uncovered during discovery that would support such a claim.

At this early stage of the proceedings, however, I cannot draw the same conclusion as to UCC&P. The Amended Complaint, and the documents attached thereto, provide sufficient indicia of control and domination by UCC&P over UCMC to survive this motion to dismiss.

As previously noted, in order to pierce the corporate veil, plaintiffs need not show UCC&P's complete domination of UCMC as to every detail of the existence of UCMC, but rather, need only allege complete domination and control with respect to the specific transaction attacked. Here, one of the "transactions attacked," and one of the bases for the breach of contract claims, is the sale of UCMC to an unfit purchaser, in derogation of a specific contractual term. Plaintiffs sufficiently allege that UCC&P completely dominated UCMC with respect to this particular transaction. They claim that UCC&P actually made the decision to sell UCMC to Ed Williams, an allegation that is not contested by defendants, and indeed one that is supported by a number of the exhibits attached to the Amended Complaint. *See* Am. Compl. at Exs. 31, 34, 37, 41. The allegation that UCC&P is a 92% shareholder of UCMC, again, a factual allegation that is not contested by defendants, further supports the conclusion that the decision to sell the company, and the decision to sell the company to a particular buyer, was made by UCC&P and not by UCMC. Moreover, plaintiffs claim that the decision to sell was hasty and ill-advised, thus supporting the inference that UCC&P failed to adequately investigate the potential purchaser, resulting in a "wrong" to

plaintiffs when the contract was breached upon completion of the sale. Additionally, there is some support for the inference of an ongoing involvement by UCC&P in UCMC's business, or a financial connection between the two companies, that might go beyond that of the normal parent/subsidiary relationship. (*See* Am.Compl.Ex. 21 discussing the fact that "UCC&P pays and charges" UCMC for the salaries of six UCMC employees and discussing UCC&P's restructuring of UCMC's operations).

Without knowing more, I simply cannot disregard this indicia of possible control and domination. Therefore, although pretrial discovery may prove plaintiff's alter ego theory to be without merit,[16] I find that the allegations of alter ego with respect to UCC&P are sufficient to withstand a motion to dismiss.

### B. Remedies for Breach of Warranty

The purchase agreement entered into between the plaintiff franchisees and UCMC contains an express warranty that the marble cleaning chemicals "meet[] Seller's specification for Material or such other specifications as have been expressly made part hereof ." (Standard Terms for Purchase of Products, Equipment and Services from Franchisor, attached to Affidavit of Daniel Gildin as Exhibit C ("Purchase Agreement"), at ¶ 8.) The clause then goes on to disclaim all other express or implied warranties, including but not limited to "all implied warranties of merchantability and fitness for a particular purpose." (*Id.*)[17] Defendants seek dismissal of

---

16. Some of the documents, in fact, directly undercut the notion of "control" by UCC&P, such as portions of the UCMC business plan which clearly indicate that UCMC would be separately incorporated and staffed, and would maintain its own bookkeeping and financial structures. *See* Am.Compl.Ex. 1 at 7, 11, 29, 35, and UCMC's Consolidated Financial Statements for December 31, 1991 and 1990, Am.Compl.Ex. 21.

17. Both the Franchise and Purchase Agreements purport to limit UCMC's liability for breach of warranty. The Franchise Agreement states that "Franchisee's exclusive remedy and Franchisor's exclusive liability for any products, equipment or chemicals delivered hereunder … shall be limited to the purchase price of the products, equipment or chemicals [or their] replacement."

(Franchise Agreement at ¶ 10.15.) The Purchase Agreement also contains a provision purporting to limit remedies for its breach (Purchase Agreement at ¶ 5), and a warranty disclaimer that states in pertinent part that

Seller warrants that Material delivered hereunder meets Seller's specification for Material or such other specifications as have been expressly made part hereof. SELLER NEITHER MAKES NOR INTENDS TO MAKE, ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, AND IT EXPRESSLY EXCLUDES AND DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

(Purchase Agreement at ¶ 8) (capitalization in original).

the breach of warranty claims in their entirety against all defendants but UCMC and, as to UCMC, they ask the Court to limit any remedy for breach of warranty to the purchase or replacement price of the allegedly defective items, as set forth in the Purchase Agreement and Franchise Agreement. Plaintiffs cite no law in support of their position that the unambiguous contract clauses limiting UCMC's warranty liability should not be honored. Indeed, they appear to concede that the parties anticipated that the remedy for such breach would be that requested by defendants—replacement of the goods or refund of the purchase price. (Pl. Br. at 28.) In any event, I agree that under New York law, the breach of warranty claims must be so limited.[18]

■ It is well-settled that under New York law, parties to a contract may exclude or modify implied warranties so long as the warranty disclaimer is conspicuous and specific. N.Y.U.C.C. § 2-316(2) (McKinney 1993); *see, e.g., Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT&T Communications, Inc.,* No. 92 Civ. 7862(KMW), 1996 WL 312535, at *6 (S.D.N.Y. June 10, 1996); *Furniture Consultants, Inc. v. Datatel Minicomputer Co.,* No. 85 Civ. 8518(RLC), 1986 WL 7792, at *5 (S.D.N.Y. July 10, 1986); *Sky Acres Aviation Servs., Inc. v. Styles Aviation, Inc.,* 210 A.D.2d 393, 620 N.Y.S.2d 442 (2d Dep't 1994); *Farm Family Mut. Ins. Co. v. Moore Bus. Forms, Inc.,* 164 Misc.2d 656, 625 N.Y.S.2d 798 (N.Y.Sup.Ct.1995). Here, there is no question that these requirements have been met. The warranty disclaimer is in capital letters and specifies the warranties that are being disclaimed. *See, e.g., Grupo Sistemas,* 1996 WL 312535, at *6; *Furniture Consultants,* 1986 WL 7792, at *5. Plaintiffs contend that defendants warranted that the chemicals sold pursuant to the Purchase Agreement were safe and fit to be used for a particular

purpose. These warranties are not contained in the Purchase Agreements and in fact have been specifically disclaimed. Therefore, any claims based on these purported warranties fail as a matter of law.

■ Similarly, parties to a contract may limit the remedies for its breach, and the statute allowing such limitations specifically anticipates the limitation agreed to by UCMC and the individual plaintiffs in this case—the price of the goods or replacement of the goods. N.Y.U.C.C. § 2-719(a) (McKinney 1993). Such limitations clauses are enforced unless the specified remedy "fail[s] of its essential purpose." N.Y.U.C.C. § 2-719(2); *Scott v. Palermo,* 233 A.D.2d 869, 649 N.Y.S.2d 289, 290 (4th Dep't 1996); *see also Rubin v. Telemet America, Inc.,* 698 F.Supp. 447, 449-50 (S.D.N.Y.1988); *Matco Elec. Co. v. American Dist. Telegraph Co.,* 156 A.D.2d 840, 843, 549 N.Y.S.2d 843, 845-46 (3d Dep't 1989). A remedy fails of its essential purpose if "the circumstances existing at the time of the agreement have changed so that enforcement of the limited remedy would essentially leave plaintiff with no remedy at all." *American Tel. & Tel. Co. v. New York City Human Resources Admin.,* 833 F.Supp. 962, 986 (S.D.N.Y.1993) (citations omitted).

Generally, whether changed circumstances have caused a limited remedy to fail of its essential purpose is a question of fact and not of law. *Piper Acceptance Corp. v. Barton,* No. 83 Civ. 4998(CSH), 1987 WL 5801, at *2 (S.D.N.Y. Jan.14, 1987). Here, however, plaintiffs have not even suggested that enforcement of the limited remedy clause would effectively deprive them of a remedy, nor do any of the facts pleaded support such a conclusion. The remedy provision provides plaintiffs with the option of replacement of the chemicals or the price they paid for the chemicals. *Compare Seybert-Nicholas*

---

**18.** As with most of the claims asserted, the Amended Complaint does not specify which corporate defendants are alleged to have breached the warranties contained in the Franchise Agreements. Assuming that plaintiffs seek to hold UCC liable on a veil-piercing theory for UCMC's breach, and, indeed, the Court can discern no other theory upon which this defendant could be held liable, for the reasons already discussed *supra,* they have failed to adequately plead alter ego liability. For that reason, the breach of warranty claims should be dismissed against UCC. As to UCC&P, as discussed *supra,* sufficient allegations in the Amended Complaint support alter ego liability for all claims sounding in contract, including the breach of warranty claims.

*Printing Corp. v. MLP U.S.A., Inc.*, No. 92 Civ. 6143(RPP), 1992 WL 315643, at *1 (S.D.N.Y. Oct.22, 1992) (motion to dismiss cause of action to reform contract clause that limited the remedies for breach to repair and replacement is denied where complaint alleged that repeated attempts to repair the item had failed and that the item continued to malfunction). In short, the clauses limiting liability for breach of warranty are enforceable and plaintiffs' claims for any purported breach may only lie against UCMC and UCC&P for replacement of the chemicals or refund of the purchase price.

### IV. The Fraud & Negligent Misrepresentation Claims

 Plaintiffs lodge numerous allegations of fraud and negligent misrepresentation in connection with the Marblelife enterprise. I find that these claims are sufficient to survive this motion to dismiss, with the exception of those against UCC, which I find to be insufficient as a matter of law. Indeed, although the Amended Complaint is neither specific nor clear as to which defendants plaintiffs seek to hold liable for any or all of the tort claims, any tort claim against UCC must fail as a matter of law. It is blackletter law that a corporation can only act through its officers, directors and employees. The Amended Complaint does not allege that any of the individual defendants were employed by and acting on behalf of UCC at the time they purportedly committed the tortious acts.[19] Moreover, the Amended Complaint does not allege that any non-defendant UCC officer or director committed a tort. Therefore, UCC is not a proper defendant as to the tort claims. What follows is a discussion of the fraud and negligent misrepresentation claims as they relate to the remaining defendants.

### A. Fraud

 Plaintiffs' fraud claims generally fall into two categories—allegations that defendants made affirmative misstatements to them and allegations that defendants omitted to disclose material facts to them. Because many of the causes of action in the Amended Complaint hinge on these purported misstatements and omissions, it may be helpful to set them forth in some detail.

Most of the purported misrepresentations occurred before the plaintiffs entered into their agreements, and plaintiffs contend that the misrepresentations were meant to induce them to enter into those agreements. Plaintiffs claim that misstatements were made to them about the Marblelife system itself—that it was unique in that it offered specialized support staff, proprietary chemicals that were safe to use under normal conditions, and that it had numerous competitive advantages that would assure its growth. (Am. Compl. at ¶¶ 34(1), 34(2), 34(7)). Also at issue are purported misrepresentations made about the computer software and the use of the Union Carbide name and trademarks by the franchisees. (Am.Compl. at ¶¶ 34(3), 34(6).) Plaintiffs also allege that they were falsely assured that there had been a dramatic increase in the use of marble in the United States (Am.Compl. at ¶ 34(4)), and that neither UCMC nor any person listed in the offering circular for Marblelife was a defendant in any pending litigation, when in fact UCMC and others were defendants in a lawsuit based on fraudulent conduct in connection with the sale of Marblelife franchises. (Am.Compl. at ¶ 34(5)). Finally, plaintiffs allege that they were falsely informed, sometime after they had signed their agreements and established their franchises, that there were no plans to sell UCMC and that, relying on these assurances, they continued to purchase supplies, chemicals and equipment under the terms of the Agreements. (Am. Compl. at ¶¶ 74 & 75.) Alternatively, plaintiffs appear to allege that defendants were negligent in making these misrepresentations. (Am.Compl. at ¶ 117.)

Plaintiffs also contend that material information was deliberately withheld from them, including the details of UCC&P's business plan for UCMC, which provided for limited

---

19. Although the Amended Complaint does not specify by whom defendant Lutjen was employed, stating that at the time of the events complained of he was "an employee of UCC or one of its subsidiaries" (Am.Compl. at ¶ 15), at least one exhibit attached to the Amended Complaint demonstrates that he was a UCC&P employee. *See* Am.Compl. at Ex. 41.

investment by UCC&P and "bail out" provisions under certain conditions (Am.Compl. at ¶¶ 75(1), 75(2)), and the fact that Master Marble Finishing, Inc., the company acquired by UCC&P which eventually became UCMC, was being sued, based on its failure to adequately perform marble care work. (Am. Compl. at ¶ 75(3).)

 The elements of a claim of fraud in California, Ohio and Texas are essentially the same. In order to state a claim for fraud in these three states, a complaint must plead (1) that defendant made a misrepresentation; (2) with knowledge that the representation was false; (3) with the intent to induce reliance on the misrepresentation by the plaintiff; (4) that the plaintiff reasonably or justifiably relied on the misrepresentation; and (5) that the plaintiff's reliance resulted in damages to him. *Lazar v. Superior Court of Los Angeles,* 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 909 P.2d 981, 984 (1996); *Sears, Roebuck & Co. v. Meadows,* 877 S.W.2d 281, 282 (Tex. 1994) (per curiam); *Friedland v. Lipman,* 68 Ohio App.2d 255, 429 N.E.2d 456, 456–57 (1980). Defendants' principle line of attack against the fraud claims is that the Amended Complaint fails, as a matter of law, to plead one of the necessary elements of fraud—reasonable reliance on the alleged misrepresentations and omissions. They rely mainly on *Rosenberg v. Pillsbury Co.,* 718 F.Supp. 1146 (S.D.N.Y.1989), for the proposition that merger and integration clauses such as that in the Franchise Agreement, "negate reasonable reliance by one party upon representations not expressly contained in the body of the contract." (Def.Mem. at 41.)[20] The Court's research, however, has uncovered no cases in California, Ohio or Texas that support this broad proposition and, in fact, cases from California and Ohio addressing the issue conclude that an integration clause does not *per se* preclude a claim of fraudulent inducement based on statements that are not contained in the contract.[21] *E.g., California State Auto. Assoc. Inter–Ins. Bureau v. Policy Management Sys. Corp.,* No. C–93–4232, 1996 WL 45280, at *11 (N.D.Cal. Jan.9, 1996) ("Under California law, a contract integration provision stating that all representations are contained therein does not bar a claim of fraudulent inducement by parol misrepresentations...."); *Continental Airlines, Inc. v. McDonnell Douglas Corp.,* 216 Cal.App.3d 388, 264 Cal.Rptr. 779, 799 (1989) (integration clause does not bar reliance on representations made in pre-contract promotional brochure that are at variance with negotiated agreements); *Coal Resources, Inc. v. Gulf & Western Indus., Inc.,* 756 F.2d 443, 447 n. 2 (6th Cir.1985) ("[A]n integration clause does not bar a party from demonstrating fraud in the inducement.") (construing Ohio law). Moreover, whether or not reliance is reasonable under any particular set of circumstances is generally not resolved as a matter of law, but is a question of fact. *See Paper Savers, Inc. v. Nacsa,* 51 Cal.App.4th 1090, 59 Cal.Rptr.2d 547, 556 (1996); *Blankenheim v. E.F. Hutton & Co.,* 217 Cal.App.3d 1463, 266 Cal.Rptr. 593, 599–601 (1990); *Crown*

**20.** The merger and integration clause states, in relevant part, that the Franchise Agreement "constitute[s] the entire agreement between the parties ... [and] [f]ranchisee acknowledges that he is entering into this Agreement ... not as a result of any representations about Franchisor made by its shareholders, officers, directors, employees, agents, independent contractors or other Marblelife franchisees, which are contrary to the terms herein set forth...." (Franchise Agreement at ¶ 27.01.)

**21.** Moreover, *Rosenberg* and the other cases cited by defendants involve agreements containing express disclaimers regarding the specific subject matter of the misrepresentations at issue. They are therefore not particularly persuasive authority for determining how the general disclaimer in the merger and integration clause in the Franchise Agreements at issue here should be treated for purposes of determining reasonable reliance. *See, e.g., Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 314 (2d Cir. 1993) (when "contract states that a contracting party disclaims the existence of or reliance upon *specified representations,* that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations [but] general and vague merger clause would not bar parol evidence to support a fraud claim.") (emphasis added); *Rosenberg,* 718 F.Supp. at 1151 (reliance on alleged misrepresentations unreasonable as a matter of law where misrepresentations were not contained in franchise agreement or offering circular that contained "detailed, explicit integration and disclaimer clauses;" there, the contractual provision sought to be avoided was "flatly contradictory to prior oral assurances").

*Prop. Dev., Inc. v. Omega Oil Co.,* 113 Ohio App.3d 647, 681 N.E.2d 1343, 1349 (1996); *Hall v. Harris County Water Control & Improvement Dist. No. 50,* 683 S.W.2d 863, 868 (Tex.App.—Houston [14th Dist.] 1984). *But see Hadland v. NN Investors Life Ins. Co.,* 24 Cal.App.4th 1578, 30 Cal.Rptr.2d 88, 93 (1994) (reliance on oral misrepresentations of insurance agent about scope of policy coverage unreasonable as a matter of law where purchaser failed to read the policy); *R.J. Wildner Contracting Co. v. Ohio Turnpike Comm'n,* 913 F.Supp. 1031, 1040 (N.D.Ohio 1996) (motion to dismiss granted where reliance on oral representation was unreasonable as a matter of law because contract contained specific disclaimer and warning).

Although I am unable to conclude as a matter of law that plaintiffs' reliance on all of defendants' purported misrepresentations was unreasonable, portions of this issue may be capable of resolution on a motion for summary judgment, after the factual record has been more fully developed.[22] Indeed, my decision sustaining the adequacy of the fraud pleadings at this juncture of the litigation is not intended to indicate that I necessarily view all of the alleged fraud claims as viable or sustainable under the laws of California, Ohio and Texas. For example, defendants challenge the viability of a fraud claim aris-

ing out of a number of specific misrepresentations, arguing that they are either barred by explicit contradictory contract terms, or that they are duplicative of the breach of contract claims, or are not actionable as a matter of law because the statements were predictions of future performance. While there may be some merit to these challenges to particular purported misrepresentations,[23] I decline to address them at this stage of the proceedings. Defendants' arguments are premised on the application of New York law, and not the state laws that I have found to be applicable. Moreover, it is not clear that the particular language of the Franchise Agreement would, as a matter of law, render any reliance on the purported misrepresentations unreasonable. Therefore, the elimination of any particular misrepresentations from the larger fraud claim would, in the Court's view, be more appropriately addressed after discovery has been completed and the issues have been properly briefed under the appropriate states' laws, in a motion for summary judgment.

### B. *Negligent Misrepresentation*

■ As an alternative to their theory that certain UCMC and UCC&P employees made intentional, fraudulent misrepresentations, plaintiffs allege that these same statements were negligently made.[24] Plaintiffs' allega-

---

**22.** In defendants' initial motion to dismiss, which as previously noted was withdrawn in order to allow plaintiffs to cure the pleading deficiencies in that document, defendants challenged the adequacy of the fraud allegations under Rule 9(b) of the Federal Rules of Civil Procedure, contending that they were not pleaded with the requisite specificity. Although the Court has some concern over the vague and conclusory allegations of fraud against some of the individual defendants in the Amended Complaint, defendants do not challenge the fraud causes of action on this ground. Whether or not particular defendants can be held liable for any fraudulent conduct may be an appropriate issue for summary judgment.

**23.** Indeed, in addition to the alleged deficiencies noted by defendants, I would point out that it is difficult to discern how the purported statements about the use of the Union Carbide name and trademark (*See* Am.Compl. at ¶ 34(6)) could even be considered false. Plaintiffs contend that they were told, prior to entering into the Franchise Agreements, that they could use the Union Car-

bide name; the fact that they could no longer use it after UCMC was sold does not make that statement false since plaintiffs do not allege that they were promised the use of the name even after a sale of UCMC. Moreover, I do not read the Amended Complaint, and the documents attached thereto, to allege that the franchisees were never permitted to use the Union Carbide name prior to the time UCMC was sold. Absent such an allegation, I cannot see how the statement can be viewed as either false or fraudulent.

**24.** The negligence section of the Amended Complaint consists of paragraphs 117 through 118. Paragraph 118 makes the allegation that "Defendants were negligent in their management, use, operation, and all other aspects of its business dealings with Plaintiffs. Said negligence was the proximate cause of Plaintiffs' injuries." This allegation is so overly broad, vague and bereft of factual support as to be meaningless. However, since the preceding paragraph refers to plaintiffs' reliance on the facts given to them by UCMC, I treat this as pleading negligent misrepresentation

tions sufficiently support a cause of action under a theory of negligent misrepresentation.

■ In California, to state a cause of action for negligent misrepresentation, plaintiff must plead (1) that defendant made a misrepresentation of a past or existing material fact; (2) that defendant had no reasonable ground for believing the statement to be true; (3) that defendant intended to induce plaintiff's reliance on the misrepresentation; (4) that plaintiff was ignorant of the true facts and justifiably relied on the misrepresentation; and (5) that plaintiff was damaged as a result. *Lincoln Alameda Creek v. Cooper Indus., Inc.*, 829 F.Supp. 325, 330 (N.D.Cal.1992) (citing *Fox v. Pollack*, 181 Cal.App.3d 954, 226 Cal.Rptr. 532 (1986)); *accord Home Budget Loans, Inc. v. Jacoby & Meyers Law Offices*, 207 Cal.App.3d 1277, 255 Cal.Rptr. 483, 487 (1989).

■ Ohio and Texas follow the approach laid out in the Restatement (Second) of Torts requiring allegations that (1) defendant, during the course of his business, profession or employment or during the course of a transaction in which he had a pecuniary interest, supplies false information to plaintiff for his guidance in his business; (2) defendant fails to exercise reasonable care in obtaining or communicating that information; (3) plaintiff justifiably relies on that false information; and (4) plaintiff suffers damage as a result of such reliance. *Delman v. City of Cleveland Heights*, 41 Ohio St.3d 1, 534 N.E.2d 835, 838 (1989); *Gutter v. Dow Jones, Inc.*, 22 Ohio St.3d 286, 490 N.E.2d 898, 900 (1986); *Federal Land Bank Assoc. of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991); *Weakly v. East*, 900 S.W.2d 755, 759 (Tex.App.1995).

Although some cases suggest that the "during the course of his business" language of the first element requires that the defendant be in the business of supplying information, such as an accountant or a lawyer, *see, e.g., Geosearch, Inc. v. Howell Petroleum*

*Corp.*, 819 F.2d 521, 525 (5th Cir.1987), liability has not been limited to that narrow class of individuals. *See, e.g., Sindel v. Toledo Edison Co.*, 87 Ohio App.3d 525, 622 N.E.2d 706 (1993) (customers prevail in action alleging negligent misrepresentation of electric company for erroneous projections of electricity needed for new store). Moreover, with respect to the alternative "pecuniary interest" prong, "officers of a corporation, although they receive no personal consideration for giving information concerning its affairs, may have a pecuniary interest in its transactions, since they stand to profit indirectly from them." *Restatement (Second) of Torts*, § 552 cmt. d (1977). Additionally, plaintiffs claim that the information was given to them in order to induce and persuade them to purchase the franchises, thus satisfying the requirement that the misinformation be relayed for their guidance in their business transactions.

■ Defendants, relying solely on New York law, assert that the allegations in the Amended Complaint fail to state a claim of negligent misrepresentation because plaintiffs have not alleged "some special relationship between the parties." (Def.Br. at 60.) [25] What specific type of relationship is required under New York law and whether plaintiffs have alleged such a relationship are matters I need not decide, since New York law is inapplicable to the tort claims. Clearly, California does not require this additional element. *See Lacher v. Southwest Diversified, Inc.*, 230 Cal.App.3d 1038, 281 Cal.Rptr. 640, 644 (1991) ("A contractual or fiduciary relationship is ... not required before liability for negligent misrepresentation may be found."); *Byrum v. Brand*, 219 Cal.App.3d 926, 268 Cal.Rptr. 609, 619–20 (1990) ("negligent misrepresentation is a claim which may be made in any type of relationship"); *see also* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 107, at 744–45 (5th ed.1984) (noting that California is among

---

as an alternative to the fraudulent misrepresentation claim. Indeed, plaintiffs in their responsive brief appear to predicate the negligence claims solely on a theory of negligent misrepresentation. *See* Pl.Br. at 34–36.

25. Defendants also claim that, as with the fraud claims, plaintiffs cannot show reasonable reliance on the negligent misrepresentations due to the merger and integration clause in the Franchise Agreement. I have already addressed and rejected that challenge *supra*.

the few states to extend liability for negligent misrepresentation to all parties and agents to a bargaining transaction). It is likewise apparent that a "special relationship" is not a prerequisite to a claim for negligent misrepresentation in either Ohio or Texas. Rather than limiting potential liability based on specified relationships between the parties, these states, mirroring the Restatement approach, limit potential plaintiffs to "intended beneficiaries or parties who foreseeably would rely upon the defendant's representations." *FDIC v. Calhoun*, 34 F.3d 1291, 1297 (5th Cir.1994) (citing *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 234–35 (Tex.App.1985)); *accord Haddon View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St.2d 154, 436 N.E.2d 212, 215 (1982) (holding that liability for negligent misrepresentation may lie when the plaintiff is a member of a "limited class whose reliance [on the misrepresentations] is specifically foreseen"); *see also Restatement (Second) of Torts, supra*, § 552(2)(a). Here, the individual plaintiffs, as anticipated purchasers of the franchises, surely were expected by defendants to rely on the misrepresentations concerning the franchises. I therefore find the claims facially adequate under the laws of California, Ohio and Texas.

To sum up, for purposes of this motion to dismiss, the Amended Complaint adequately pleads claims of fraud and, in the alternative, negligent misrepresentation, against all of the defendants except UCC. Since none of UCC's officers, directors, employees or agents are alleged to have made or participated in any fraudulent or negligent misrepresentations, the claims against UCC should be dismissed.

### V. The Civil Conspiracy Claims

■ The crux of plaintiffs' civil conspiracy claims, which are apparently brought against all of the defendants, is that the defendants, with the knowledge that the Marblelife system was "wholly unreliable, unprofitable, and inadequate to perform a quality job cleaning marble and other stone surfaces," conspired to fraudulently induce them into purchasing the franchises and the prod-

ucts. (Am.Compl. at ¶¶ 106–107). The substantive allegation is as follows:

> Defendants conspired to defraud Plaintiffs into purchasing franchises and their products. Defendants jointly and on separate occasions acted in concert to intentionally misrepresent vital facts to Plaintiffs. Such distortions were made consciously and in an effort to induce Plaintiffs and other unsuspecting individuals into believing that they were purchasing viable franchises and products that would evolve into profitable businesses. As a result of Defendants' actions, Plaintiffs have been injured in an amount within the jurisdictional limits of this Court.

(*Id.* at ¶ 107.) Defendants moved to dismiss this claim based on their conclusion that New York does not recognize a tort sounding in civil conspiracy. (Def.Br. at 52.) Of course, I need not address the validity of that argument, since New York law does not apply to the civil conspiracy claims.

■ California, Ohio and Texas all recognize the common-law tort of civil conspiracy, and the prerequisites for a cause of action in all three states are essentially the same. Such a claim must allege (1) the formation and operation of the conspiracy between two or more persons; (2) the wrongful acts that were done pursuant to the conspiracy; and (3) the damage resulting from such act or acts. *Munday v. Real Estate Advisors, Inc.*, No. C–95–20143, 1995 WL 549015, at *4 (N.D.Cal. Sept. 12, 1995) (citing *Unruh v. Truck Ins. Exch.*, 7 Cal.3d 616, 631, 102 Cal.Rptr. 815, 498 P.2d 1063 (1972)); *Harry's Cocktail Lounge, Inc. v. McMahon*, CV 93–3566, 1995 WL 338885, at *14 (C.D.Cal. Mar.15, 1995) (citing *Ahrens v. Superior Court*, 197 Cal.App.3d 1134, 243 Cal.Rptr. 420, 429 (1988)), *aff'd*, 103 F.3d 138, 1996 WL 683613 (9th Cir.1996); *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863, 866–67 (1995); *Miskinis v. Chester Township Park Dist.*, 112 Ohio App.3d 466, 679 N.E.2d 39, 43 (1996); *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 90 Ohio App.3d 284, 629 N.E.2d 28, 33 (8th Dist. 1993); *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex.1996); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.

1983); *Stroud v. VBFSB Holding Corp.*, 917 S.W.2d 75, 82 (Tex.App.1996).

As the second element of the cause of action suggests, civil conspiracy is not itself an actionable wrong, and must be supported by sufficient allegations that an independent tort or wrong was committed pursuant to the conspiracy. *See, e.g., General Am. Life Ins. Co. v. Rana,* 769 F.Supp. 1121, 1125 (N.D.Cal.1991) ("To establish the 'wrongful act' element of civil conspiracy, [a party] must satisfy all of the elements of a cause of action for some other tort or wrong.") (applying California law); *Monastra v. Konica Bus. Machs., U.S.A., Inc.,* 43 Cal.App.4th 1628, 51 Cal.Rptr.2d 528, 539 (1996) ("Standing alone, a conspiracy does no harm and engenders no liability; it must be activated by the commission of an actual civil wrong."); *Miskinis,* 112 Ohio App.3d 466, 679 N.E.2d 39, 43 (civil conspiracy requires "the existence of an unlawful act independent from the actual conspiracy"); *Closs v. Goose Creek Consol. Indep. Sch. Dist.,* 874 S.W.2d 859, 872 (Tex.App.1994) ("conspiracy is not actionable absent evidence of a wrongful act"). However, since the gravamen of a civil conspiracy is an agreement to commit the wrongful act, it need not be alleged that each co-conspirator committed the underlying tort, so long as they "share with the immediate tortfeasor a common plan or design in its perpetration." *Kidron v. Movie Acquisition Corp.,* 40 Cal.App.4th 1571, 47 Cal.Rptr.2d 752, 757 (1995) (citation omitted); *accord Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 157 Cal.Rptr. 392, 598 P.2d 45, 51 (1979) (en banc) ("As long as two or more persons agree to perform a wrongful act, the law places civil liability for the resulting damages on all of them, regardless of whether they actually commit the tort themselves."); *Weinbaum v. Goldfarb, Whitman & Cohen,* 46 Cal.App.4th 1310, 54 Cal.Rptr.2d 462, 465 (1996) (same); *Goose Creek,* 874 S.W.2d at 872 (conspiracy is actionable where wrongful act "committed by at least one of the alleged conspirators"); *see also Trautz v. Weisman,* 819 F.Supp. 282, 289 (S.D.N.Y.1993) (complaint grounded on RICO civil conspiracy need not allege that each defendant actually committed a predicate act). Here, as discussed *supra,* the Amended Complaint adequately alleges an independent tort committed in furtherance of the conspiracy—the misrepresentations made to fraudulently induce the individual plaintiffs into entering into the Franchise Agreements.

Under the pleading standards of Rule 8(a) of the Federal Rules of Civil Procedure, at a minimum, a complaint sounding in conspiracy must either expressly allege an agreement on the part of the co-conspirators or put forth sufficient facts from which a trier of fact can infer that such an agreement was made. *See, e.g., Hecht,* 897 F.2d at 26 n. 4 ("the complaint must allege some factual basis for a finding of a conscious agreement among the defendants"); *Butala v. Agashiwala,* No. 95 Civ. 936(JGK), 1997 WL 79845, at *9 (S.D.N.Y. Feb.24, 1997) (in RICO civil conspiracy complaint "plaintiff must plead allegations that each defendant knowingly agreed to participate in the conspiracy"); *Dillion v. U.S. Postal Serv.,* No. 94 Civ. 3187(SAS), 1995 WL 447789, at * 4 (S.D.N.Y. July 28, 1995) ("While the lack of an express allegation of an agreement is not fatal to a conspiracy claim, a plaintiff must allege sufficient facts from which a trier of fact can infer an agreement."); *In re Sunrise Tech. Secs. Litig.,* No. C–92–0948, 1992 WL 359636, at * 6 (N.D.Cal.1992) (complaint dismissed for failure to allege facts demonstrating that an express or tacit agreement had been reached to engage in the conspiracy); *Alfus v. Pyramid Technology Corp.,* 764 F.Supp. 598, 607 (N.D.Cal.1991) ("To survive a motion to dismiss, plaintiff must allege with sufficient factual particularity that defendants reached some explicit or tacit understanding or agreement.").

Defendants do not argue that the conspiracy claims are deficient because plaintiff has failed to plead the requisite elements. Moreover, having concluded that the Amended Complaint contains sufficient allegations to implicate UCMC and UCC&P employees and officers in what can be viewed as closely connected fraudulent statements or omissions, with a common goal, an agreement can be reasonably inferred. The Court would note, however, that the allegations of conspiracy are extremely broad and vague. While facts alleged in the Amended Complaint

might be sufficient to infer a conspiracy by some of the alleged tortfeasors, I question whether the formation of an agreement to commit a wrongful act among all of the defendants can be gleaned from the Amended Complaint.[26] I would further note that there is a substantial body of law which holds that in most circumstances employees and agents of related corporate entities, such as a parent and a subsidiary, cannot conspire among themselves. *See Elliott v. Tilton,* 89 F.3d 260, 265 (5th Cir.1996) (noting that under Texas law "a corporation or other company cannot conspire with itself, no matter how many of its agents participate in the complained of action") (citation omitted); *Black v. Bank of America N.T. & S.A.,* 30 Cal. App.4th 1, 35 Cal.Rptr.2d 725, 727 (1994) ("It has long been the rule in California that agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their own advantage.") (citation omitted); *see also Vosko v. Chase Manhattan Bank, N.A.,* 909 S.W.2d 95, 100 n. 7 (Tex.App.1995) ("As a matter of law ... a parent and subsidiary corporation, or their employees or agents acting within the scope of their employment, [cannot] conspire."); *Atlantic Richfield Co. v. Misty Prods., Inc.,* 820 S.W.2d 414, 420 (Tex.App.—Hous.(14th Dist.) 1991) ("As a matter of law, a parent corporation cannot conspire with its fully owned subsidiary.") These are issues which may be susceptible to resolution on a motion for summary judgment. At this stage, and particularly in view of the fact that defendants have not raised any of these issues in support of their motion to dismiss the civil conspiracy claims, I decline to dismiss them on these grounds.[27]

**26.** For example, the Amended Complaint mentions defendants Ehrens and Clerico but a single time, in the section defining the parties. There, plaintiffs merely identify the positions these defendants held with UCMC and conclusorily allege that they "approved, participated in and directed the unlawful conduct of which Plaintiffs complain." (Am.Compl. at ¶¶ 11, 14.) No further mention is made of either of these defendants in the body of the Amended Complaint or in the numerous documents attached as exhibits which

## VI. The Tortious Interference Claims

Plaintiffs bring claims on the related theories of tortious interference with contract and tortious interference with prospective business relations. First, they assert that "UCC&P, UCC and its employees" (the "Non–Franchisor Defendants") tortiously interfered with the contract between UCMC and the plaintiffs:

> in that, among other things, they decided to sell the company and strip the venture. Defendants induced Plaintiffs into purchasing the franchises by indicating that purchasers could have use of the recognized "Union Carbide" trademarks and service marks. Defendants are liable for tortious interference with a contract as they interfered with Plaintiff's contract with UCMC by inducing or otherwise causing them not to perform on the contract and/or by making Plaintiff's performance on the contract more burdensome, difficult or impossible, or of less or no value to the Plaintiffs even if he tried to perform upon it.

(Am.Compl. at ¶ 107.) The claims of tortious interference with prospective business relations, which again are limited to the Non–Franchisor Defendants, allege interference with plaintiffs' prospective business relations with both UCMC and unnamed "prospective customers." (Am.Compl. at ¶¶ 108–109.) Plaintiffs aver that the Non–Franchisor Defendants wrongfully interfered with their future business relations with UCMC

> by selling UCMC to [an] ill-equipped [buyer] and stripping the venture. Defendants induced Plaintiffs into purchasing the franchises by indicating that purchasers could have use of the recognized "Union Carbide" trademarks and service marks.

would suggest their roles in or connection with the alleged conspiracy.

**27.** However, since it is not alleged that any employee of UCC participated in any fraudulent activity, and there are no other allegations in the Amended Complaint otherwise suggesting UCC's participation in the purported fraudulent scheme, the Amended Complaint fails as a matter of law under Rule 12(b)(6) to state a claim against UCC for civil conspiracy.

(Am.Compl. at ¶ 108.) With respect to plaintiffs' "prospective customers," the Amended Complaint alleges:

> Defendants have tortiously interfered with the prospective business relations between the Plaintiffs and prospective customers. Even Defendants realized the value of the "Union Carbide" name in the seeking of major national accounts. Plaintiffs gained credibility in having the backing of UCC and UCC&P when seeking new customers.

(Am.Compl. at ¶ 109.)

Defendants move to dismiss all of the tortious interference claims on various grounds premised on the applicability of New York law. However, under the applicable laws of California, Ohio and Texas, and construing the allegations in the Amended Complaint in favor of plaintiffs, I find that plaintiffs have stated a claim for tortious interference with contractual relations against UCC&P and the individual defendants Lutjen and Kennedy.[28] The allegation of tortious interference with business relations, however, fails to state a claim and should be dismissed.

■ The torts of interference with contractual relations and interference with prospective economic advantage both protect the parties' interest in stable economic relationships. *Pacific Gas and Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 270 Cal.Rptr. 1, 791 P.2d 587, 590 (1990). The principal difference between the two is that the former requires the existence of a valid contract, while the latter simply requires the existence of an economic relationship between plaintiff and a third party. *Id.* In California, interference with contractual or business relations requires a showing of (1) the existence of a valid contract between the plaintiff and a third party or an economic relationship between the plaintiff and a third party which will probably result in future economic benefit to the plaintiff; (2) defendant's knowledge of the contract or business relationship; (3) defendant's intentional acts designed to induce a breach or disruption of the contractu-

al or business relationship; (4) actual breach or disruption of the contract or relationship; and (5) resulting damage. *Schlafly v. Public Key Partners*, No. 94–20512, 1996 WL 88836, at *2 (N.D.Cal. Feb. 27, 1996) (citing *Pacific Gas*, 270 Cal.Rptr. 1, 791 P.2d at 589–90); *Morton v. Rank Am., Inc.*, 812 F.Supp. 1062, 1075 (C.D.Cal.1993) (citing *Pacific Gas*, 270 Cal.Rptr. 1, 791 P.2d at 590 n. 2); *Youst v. Longo*, 43 Cal.3d 64, 233 Cal.Rptr. 294, 729 P.2d 728, 733 n. 6 (1987).

■ Ohio essentially follows the approach laid out in the Restatement of Torts. *See Restatement (Second) of Torts, supra*, §§ 766, 766A. Under Ohio law, a cause of action for tortious interference with business relations or contract is established when "one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 924 F.Supp. 1474, 1503–04 (N.D.Ohio Mar.19, 1996) (citing *Smith v. Klein*, 23 Ohio App.3d 146, 492 N.E.2d 852, 855 n. 1 (1985)); *Brahim v. Ohio College of Podiatric Med.*, 99 Ohio App.3d 479, 651 N.E.2d 30, 36 (1994), *appeal denied*, 72 Ohio St.3d 1422, 648 N.E.2d 515 (1995); *Juhasz v. Quik Shops, Inc.*, 55 Ohio App.2d 51, 379 N.E.2d 235, 238 (1977). The elements of the claims are substantially similar in Texas, which requires pleading (1) the existence of a contract or a reasonable probability that a contract would have been made; (2) a willful and intentional act of interference; (3) proof that such act of interference was the proximate cause of the damage; and (4) proof that actual damage or loss occurred. *Mason v. FDIC*, 888 F.Supp. 799, 807 (S.D.Tex.1995) (citing *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex.1993) and *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931 (Tex.1991)); *Weakly v. East*, 900 S.W.2d 755, 759 (Tex.App.1995); *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex.1995).

---

28. As previously noted, no UCC employee is alleged to have participated in any tortious conduct, including tortious interference, and therefore these claims cannot survive against UCC. Moreover, since the only individual employees of UCC&P named as parties in the Amended Complaint are Kennedy and Lutjen, I read the words "its employees" in the allegation to refer to these individuals only.

Uniformly, intent to interfere with the contractual or business relationship is considered the *sine qua non* of the torts, and it therefore must be pleaded in the complaint in order to escape dismissal. *TransWorld Airlines, Inc. v. American Coupon Exch., Inc.*, 913 F.2d 676, 690 (9th Cir.1990) (in actions for inducing breach of contract or for intentional interference with economic advantage "it is essential that plaintiff plead and prove that the defendant intended to induce a breach ... [or performed] intentional acts ... designed to disrupt the relationship") (citation omitted) (applying California law); *Rickel v. Schwinn Bicycle Co.*, 144 Cal. App.3d 648, 192 Cal.Rptr. 732, 738 (1983) (must allege "some facts that take defendant's actions out of the realm of legitimate business transactions"); *Kand Med., Inc. v. Freund Med. Prods., Inc.*, 963 F.2d 125, 127 (6th Cir.1992) (recognizing that merely causing a breach of contract is insufficient to establish tortious interference in the absence of the requisite intent to induce the breach) (applying Ohio law); *Cole v. Hall*, 864 S.W.2d 563, 567 n. 6 (Tex.App.1993) (must plead element of intent, and mere allegation that defendant committed tortious interference by "falsely reporting her wages" is insufficient in the absence of an allegation that she "intentionally reported her wages falsely"); *see*

*Prosser and Keeton on the Law of Torts, supra*, §§ 129 & 130, at 983 and 1009 (discussing the fact that liability for both types of tortious interference hinges on the defendants' purpose in causing the interference and that liability will be found only where "the reason underlying [defendant's] interference is a purely malevolent one, and a desire to do harm to the plaintiff for its own sake.")

Read liberally, I construe the contractual interference claim as alleging that UCC&P caused UCMC to breach its existing contracts with the franchisees when, as a parent corporation seeking to cut its losses, it made a hasty decision, based on the fact that it was losing money, to sell its subsidiary to a buyer who was financially incapable of performing the terms of the contract.[29] Any such sale would have resulted in a breach of the Franchise Agreement because of the explicit provision requiring sale to a financially healthy purchaser. Thus, assuming that UCC&P stood to benefit economically from the quick sale of UCMC to a purchaser who was ill-equipped financially to perform under the Franchise Agreement, the Amended Complaint alleges a sufficient basis to infer intent to cause a breach of the contract. Further development of the record may well reveal the infirmity of this claim.[30] Indeed,

29. Read literally, the tortious interference with contract claim appears to be based on the mere sale of the company and the fact that plaintiffs were adversely affected by the sale because they lost their affiliation with Union Carbide and their right or opportunity to use the Union Carbide trademark. Since the contract explicitly granted defendants the right to sell UCMC (Franchise Agreement at ¶ 33.01(8)), and since it further specifically withheld any right to use of the trademark or any benefit of the Union Carbide name association once UCMC was sold (*Id.* at ¶¶ 19.01, 32.01(8)), it is doubtful that a claim would lie for these acts alone and their consequences.

30. Although the parties have not raised this issue, and it is premature to decide it at this juncture, the Court notes that the mere sale of UCMC by UCC&P, even assuming it had the effect of interfering with plaintiffs' contractual or business relationships, might be considered privileged, and, therefore not actionable as a tort, under the laws of California, Ohio and Texas. *See GHK Assocs. v. Mayer Group, Inc.*, 224 Cal. App.3d 856, 274 Cal.Rptr. 168, 185 (1990) (noting that, under certain circumstances, parent and subsidiary corporations have the privilege to interfere with the contractual relations of one

another); *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988) (parent company privileged to interfere with contracts of its subsidiary in order to further its legitimate business interests) (applying Ohio law); *Deauville Corp. v. Federated Dep't Stores, Inc.*, 756 F.2d 1183, 1196 (5th Cir.1985) (as a matter of law, parent is privileged to interfere with wholly-owned subsidiary's contracts because of superior financial interest arising out of stock ownership) (applying Texas law). In fact, some of the Texas appellate courts have held that parents and subsidiaries are incapable as a matter of law of tortiously interfering with the contracts or business relations of each other. *H.S.M. Acquisitions, Inc. v. West*, 917 S.W.2d 872, 882 (Tex.App.1996); *American Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 336 (Tex.Ct. App.1991). *See also American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir.) (no tortious act where parent terminates contract of subsidiary that is losing money), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *see also Perry v. International Transp. Workers' Fed'n*, 750 F.Supp. 1189, 1202 (S.D.N.Y.1990) ("corporate executives who decided to 'wind down' the affairs of a subsidiary and terminated a contract

in the end, the tortious interference with contract allegations may amount to no more than a breach of contract claim. However, at this point in the litigation, the allegations are sufficient to state a claim under this theory.

█ The same cannot be said of the claims alleging tortious interference with prospective business relations. Plaintiffs do not identify the "prospective customers" with whom they hoped to form relationships,[31] nor do they allege a basis upon which it could be inferred that any such relationships would likely have been formed but for defendants' deliberate interference, a deficiency that has led at least one court in Ohio to dismiss a tortious interference claim. *See Adkins v. General Motors Corp.*, 556 F.Supp. 452 (S.D.Ohio 1983) (dismissing tortious interference claim as "not well-pleaded under Ohio law" where plaintiffs failed to identify unnamed third parties who were purportedly induced not to enter into contracts). Although at oral argument, plaintiffs' counsel alluded to the fact that the franchisees had been assured by Union Carbide that they would be servicing the Hilton Hotels national account (Hearing Tr. at 56), no allegation in the Amended Complaint and none of the exhibits attached thereto, support the notion that this hope of obtaining such an account ever took any concrete form, such as actual contact between the franchisees and the prospective customer, either directly or indirectly, that resulted in an economic loss to plaintiffs.[32]

Moreover, the Amended Complaint is bereft of allegations that defendants, in selling UCMC, intended to interfere with plaintiffs' prospective business relations with any third parties. At most, plaintiffs allege that certain actions or decisions on the part of UCC and UCC&P, actions that were contemplated under the terms of the Franchise Agreements, resulted in adverse consequences to them. Nowhere is it alleged that defendants had a tortious intent, nor is there a basis in the Amended Complaint to infer such intent. For example, plaintiffs do not allege what benefit defendants could have hoped to derive from interfering with the prospective business relations between the franchisees and third parties, especially given the fact that the sale of UCMC effectively put defendants out of the marble cleaning business. Thus, it cannot even be inferred that by such interference the Non–Franchisor Defendants hoped to garner this business for themselves. Nor are any allegations made that the Non–Franchisor Defendants had any other motivation that would have driven them to purposely interfere with the franchisee's business relationships. Under the laws of California, Ohio and Texas, cause and effect, absent pleaded intent or sufficient facts giving rise to an inference of intent, are clearly insufficient to state a claim for tortious interference. *See Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1456 (9th Cir.) (in cases alleging contractual or business interference "[m]otive or purpose to disrupt ongoing business relationships is of central concern") (citing California cases), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983); *Garter-Bare Co. v. Munsingwear Inc.*, 723 F.2d 707, 716 (9th Cir.) (quoting *Rickards*, 704 F.2d at 1456), *cert. denied*, 469 U.S. 980, 105 S.Ct. 381, 83 L.Ed.2d 316 (1984) (to impose liability for tortious interference "some identifiable pecuniary or economic benefit must accrue to [defendants] that formerly accrued to [plaintiffs]."); *DeVoto v. Pacific Fidelity Life Ins. Co.*, 618 F.2d 1340, 1347 (9th Cir.)

with plaintiff were not liable for tortious interference with contract").

**31.** I view the tortious interference with prospective business claims as relating only to plaintiffs' prospective relations with future customers, not its existing contractual relationship with UCMC. Any tortious interference with plaintiffs' relationship with UCMC resulting from UCC&P's sale of UCMC would necessarily be in the nature of tortious interference with contract, discussed *supra*, since plaintiffs and UCMC were in a contractual relationship.

**32.** Apparently, at some point, one of the franchisees, Al Santangelo, approached UCMC and informed it that he and a partner had a connection at Hyatt Hotels. *See* Am.Compl. at Ex. 41. There is no indication that any discussions that may have taken place developed beyond the preliminary stages or resulted in a contract being signed. Moreover, Mr. Santangelo is not a plaintiff in this action.

(Under California law "[t]he inducement of a breach does not always vest third or incidental persons with a tort action against the one who interfered. Where the actor's conduct is not criminal or fraudulent, and absent some other aggravating circumstances, it is necessary to identify those whom the actor had a specific motive or purpose to injure by his interference and to limit liability accordingly."), *cert. denied*, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980); *see also United States Med. Corp. v. M.D. Buyline, Inc.*, 753 F.Supp. 676, 681 (S.D.Ohio 1990) (declining to dismiss claim for tortious interference because "[p]laintiff has sufficiently pled intent by claiming that defendant intended by its actions to destroy plaintiff's business relationships"); *Cole*, 864 S.W.2d at 567 n. 6 (upholding trial court judgment based in part on appellant's failure to plead intent in support of tortious interference claim).

Thus, because the Amended Complaint lacks any allegations supporting the notion that the Non–Franchisor Defendants intended to interfere with the prospective business relations of plaintiffs, and because it fails to allege any facts that would form the basis for inferring that there was a reasonable probability that they would have formed other business relations absent such interference, the claims for tortious interference with prospective business relations fail as a matter of law. I therefore recommend that they be dismissed.

### VII. The state statutory Claims

In addition to their breach of contract and common-law tort claims, plaintiffs allege violations of Texas, Connecticut and Massachu-

setts consumer protection statutes (Am. Compl. at ¶¶ 76–87; ¶¶ 97–100; ¶¶ 93–96) and violations of the California Franchise Investment Law (Am.Compl. at ¶¶ 88–92).[33] Defendants challenge the adequacy of all of these claims, on the grounds that they are precluded by the choice of law provision in the Franchise Agreement, barred by the applicable statutes of limitations and because, assuming they are unaffected by the choice of law provision and were timely filed, the Amended Complaint fails to allege facts that would state causes of action for the violation of these statutes. Because I find that the claims based on the Texas, Connecticut and California statutes are time-barred, there is no need to address defendants' alternative grounds for dismissal.[34] However, because the claim based on the Massachusetts statute is not time-barred, the substance of the allegations in the Amended Complaint will be examined to determine whether they state a cause of action under the statute.

### A. Texas Deceptive Trade Practices Act

The Texas Deceptive Trade Practices Act (TDTPA) is a consumer protection law that prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce ...." Tex. Bus. & Com.Code Ann. § 17.46(a) (West 1996). Essentially, plaintiff Maltz alleges that defendants violated this statute when, prior to his signing the Franchise Agreement, they conveyed to him false information about its terms and withheld material information about the chemicals, equipment and services offered under the contract. (Am.Compl. at ¶¶ 77–83.)[35] Even assuming that the allega-

---

**33.** Specifically, Maltz alleges violations of the Texas Deceptive Trade Practices Act, Lynch alleges violations of the Massachusetts Consumer Protection Act and the Connecticut Unfair Trade Practices Act, and Lynch, Hackett and Selik allege violations of the California Franchise Investment Law. Began makes no claims under these statutes.

**34.** As an initial matter, I do not agree that merely because the state statutory claims are not grounded in New York law, they are precluded by the choice of law provision in the Franchise Agreement. I do not view these claims as contractual in nature, as they are based on the fraudulent conduct of defendants which purport-

edly induced the plaintiffs to enter into the agreements. Moreover, the Second Circuit has explicitly rejected the argument urged here by defendants—that a choice of law provision in a franchise agreement precludes statutory claims arising under the laws of states other than the state chosen by the parties to govern their contract disputes. *Valley Juice*, 87 F.3d at 612.

**35.** The same series of fraudulent misrepresentations and fraudulent omissions that provide the basis for the common law fraud, civil conspiracy and negligent misrepresentation claims, discussed and described *supra*, also underlie all of the state statutory claims.

tions in the Amended Complaint are sufficient to state a cause of action under the TDTPA, as a matter of law they fail to state a claim because they are barred by the statute of limitations.

The TDTPA provides that all actions "must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered, or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice." Tex. Bus. & Com.Code Ann. § 17.565 (West 1996). The Amended Complaint alleges that the misrepresentations giving rise to the statutory violation occurred between May 24, 1991 and July 24, 1991. (Am.Compl. at ¶¶ 34–35.) The initial Complaint in this action was filed in Harris County Texas on October 27, 1995 (Pl.Br. at 1), clearly more than two years after the latest deceptive act alleged. Even applying the more generous accrual date used by defendants—August 8, 1991, the date on which Maltz executed his Franchise Agreement—the TDTPA claim is still barred under the two year limitations period.

Nor is the cause of action saved by the "discovery" provision of the statute, because plaintiffs concede in the Amended Complaint that Maltz discovered that the representations were false either sometime in 1992 (Am. Compl. at ¶ 38) or, with respect to the imminent sale of UCMC, in January, 1993.[36] (See Am.Compl. at ¶¶ 73–74.) Moreover, numerous exhibits attached to the Amended Complaint confirm that Maltz was aware, or with the exercise of reasonable diligence, should have been aware, that the representations made by the defendants were false more than two years prior to the filing of the Complaint. (See Am.Compl., Exs. 29, 32, 35–36, 41–42.) Thus, even giving Maltz the widest latitude permitted by the allegations in the Amended Complaint, his claim under the TDTPA is time-barred.

### B. Connecticut Unfair Trade Practices Act

Connecticut's Unfair Trade Practices Act ("CUTPA") prohibits any person from "engag[ing] in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. Ann. § 42–110b(a) (West 1996). Plaintiff Lynch alleges that defendants violated this statute when defendant Jones made misrepresentations to her about the Marblelife system and its affiliation with UCC, and repeated the same misrepresentations allegedly made to Maltz during a meeting in Danbury, Connecticut on May 29, 1990. (Am.Compl. at ¶ 48, see also Am. Compl. at ¶ 34.) Lynch contends that she did not begin to fully discover that these representations were false until 1992. (Am. Compl. at ¶ 53.) However, when Lynch discovered or should have discovered the true nature of the alleged misrepresentations made to her is irrelevant, since no discovery rule applies to CUTPA claims. Moreover, assuming that the facts alleged would state a

---

**36.** In their responsive papers, plaintiffs assert that the state statutory claims should not be dismissed on limitations grounds because there is a "genuine issue of fact" as to when Maltz, Lynch, Hackett and Selik discovered or should have discovered the deceptive statements underlying these claims. (Fl.Br. at 12, 17, 22.) However, in the Amended Complaint, plaintiffs state that these individuals began discovering that the representations were false in 1992, when UCC and UCC&P began seeking a buyer for UCMC. (See Am. Compl. at ¶¶ 38, 46, 54, 69.) Moreover, plaintiffs concede that as of approximately January, 1993, UCC and UCC&P "were advertising the 'benefits' of the sale to Franchisees like Maltz." (Am.Compl. at ¶ 74.) It is well-settled that formal judicial admissions in a pleading are conclusive against the party making the admission absent fraud or mistake. See, e.g., Western

World Ins. Co. v. Stack Oil Inc., 922 F.2d 118, 121–22 (2d Cir.1990); Dortz v. City of New York, 904 F.Supp. 127, 146 n. 6 (S.D.N.Y.1995); Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland, 763 F.Supp. 28, 32 (S.D.N.Y.1991); Royal Consulting, Inc. v. Agri–Mark, No. 89 Civ. 5436(CHS), 1990 WL 83445, at *3 (S.D.N.Y. June 13, 1990)(statements made in complaint as to when party had notice of injury are binding on party). Moreover, despite their general disclaimer, plaintiffs still concede that they knew about the misrepresentations, at the earliest, in 1992, when UCC began seeking a buyer, or at the latest, as of February 8, 1993, when UCC announced the sale. (See Pl.Br. at 13, 17, 21–22; see also Hearing Tr. at 41.) Therefore, there is no material issue with respect to when the plaintiffs knew or should have known of the deceptive nature of the statements.

claim under the CUTPA, any such claim is barred by CUTPA's statute of limitations.

In order to be timely, an action under the CUTPA must be brought no later than "three years after the occurrence of the violation." Conn.Gen.Stat.Ann. § 42–110g(f) (West 1996). Connecticut courts have specifically held that no "discovery rule" applies to toll CUTPA claims. *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 541 A.2d 472, 476 (1988). The CUTPA claim accrued in this case, and hence the statue of limitations began to run, in approximately November, 1990, when Lynch signed the Franchise Agreement (Am.Compl. at ¶ 53) in purported reliance on the misrepresentations made by Jones. *See Fichera*, 541 A.2d at 474. Thus, the Complaint, filed almost five years later, is untimely as to this claim.[37]

 Plaintiffs assert that Lynch's claim is nevertheless timely, because the statute of limitations was tolled under Connecticut's narrow "continuing violation" doctrine, and that they "believe this narrow exception exists in the instant case." (Pl.Br. at 19.) The cases cited by plaintiffs merely set forth the parameters of the continuing violation doctrine and do not support the application of the doctrine to this case.

 The statute of limitations on a CUTPA claim will not begin to run "so long as a defendant is engaged in a continuing course of conduct." *Vigneau v. Storch Eng'rs*, No. CV 890700122S, 1995 WL 767984, at *8 (Conn.Super.Ct. Dec.4, 1995); *accord Fichera*, 541 A.2d at 474; *Blair v. Titan Sports. Inc.*, No. CV 940138441S, 1996 WL 56990, at * 2 (Conn.Super.Ct. Jan.24, 1996). But first, plaintiff must show that there was a breach of a duty that continued to exist after the initial wrongful act occurred. *Fichera*, 541 A.2d at 474. Such a duty will only be found where plaintiff can show a fiduciary relationship between the parties regarding the substance of the CUTPA claim that gives rise to a continuing duty, or some later wrongful conduct of defendant

related to the prior wrongful act. *Id.* Plaintiffs do not allege the existence of any special duty between themselves and the defendants, and it is unclear whether the relationship between a franchisor and a franchisee would give rise to such a duty. *Compare Fichera*, 541 A.2d at 475 (mere contractual relationship requiring performance under contract does not create a continuing duty) *with Vigneau*, 1995 WL 767984, at * 8 (partnership relationship gives rise to continuing duty.)

Inasmuch as Lynch relies on the contention that defendants continued to wrongfully conceal their plans to sell UCMC (*see* Am .Compl. at ¶¶ 72–73) as the basis of a "continuing wrong" that would toll the statute of limitations, such reliance is misplaced. Plaintiffs contend that Freeman's announcement on July 11, 1992 that UCMC and UCC&P were not seeking a buyer for UCMC provides the lynchpin needed to establish a "continuing wrong." However, even if this statement constitutes a misrepresentation, it is not related to the earlier misrepresentations alleged, which had nothing whatsoever to do with any impending sale of UCMC. Lynch's CUTPA claim is entirely premised on the misrepresentations made during her meeting with UCMC officials on May 29, 1990 in Danbury Connecticut. Lynch nowhere alleges that she was told, prior to signing the Franchise Agreement, that the contract provision permitting sale of UCMC would not be exercised for any specified period of time. Freeman's misrepresentation, therefore, cannot be coupled with the earlier unrelated misrepresentations to constitute a "continuing wrong" for purposes of tolling CUTPA's three-year statute of limitations.

Moreover, even if the necessary relationship could be shown between these two statements, according to the Amended Complaint, Freeman's denial, which was the last of the misrepresentations, and thus the end of the continuing course of conduct, occurred on July 11, 1992. (Am.Compl. at ¶ 73.) Thus,

---

37. The signature page of Lynch's Franchise Agreement, attached as part of Exhibit A to the Gildin Affidavit, actually indicates that Lynch signed the agreement on October 8, 1991. However, even if Lynch signed the agreement on that date, her claim would nonetheless be barred under the three-year statute of limitations, since the Complaint was filed almost four years after that date.

even construing the Amended Complaint liberally as alleging a continuing course of conduct, the CUTPA claim is nevertheless time-barred since the Complaint was filed more than three years after the last alleged act in this course of conduct occurred.

### C. The California Franchise Investment Law

█ California's Franchise Investment Law ("CFIL") makes it unlawful, *inter alia*, to willfully make untrue statements of material fact in a franchise circular. *See* Cal. Corp.Code § 31202 (West 1997). Plaintiffs Hackett, Lynch and Selik allege that defendants made misleading statements in the Unit Franchise Offering Circular, and omitted to state certain material facts which would have made the statements not misleading, in violation of CFIL. (Am.Compl. at ¶¶ 89–92.) However, as with the claims under Texas and Connecticut law, even assuming that the allegations in the Amended Complaint are sufficient to state a cause of action under CFIL, they must be dismissed because they are barred by the applicable statute of limitations.

Under CFIL, a cause of action must be "brought before the expiration of four years after the act or transaction constituting the violation [or within] one year after the discovery by the plaintiff of the fact constituting the violation." Cal.Corp.Code § 31303 (West 1997). It is unclear when the allegedly untrue statements were "made" in the Franchise Agreements, but at the very latest, the causes of action under CFIL accrued as of the time the plaintiffs signed the Agreements. Since the Amended Complaint states that Lynch signed her Franchise Agreement on November 1, 1990,[38] Hackett signed his agreement on June 21, 1990 and Selik signed his agreement on May 13, 1990 (Am.Compl. at ¶¶ 53, 45, 68), the operative outside dates for the filing of the Complaint, in order for the claims to be timely, occurred between May 13 and November 1, 1994. The Complaint was not filed until October 27, 1995, and the claims are thus time-barred.

█ Nor are the claims saved by applying the statute's discovery rule. The Amended Complaint admits that Lynch, Hackett and Selik were aware that the representations in the Franchise Agreement were false some time in 1992. (Am.Compl. at ¶¶ 46, 54, 69.) Moreover, even absent these admissions, documents attached to the Amended Complaint make clear that these plaintiffs either knew or should have known of the falsity of the statements long before October 27, 1994. (*See* Am.Compl., Exs. 29, 31–42.) Finally, under any scenario, plaintiffs were aware of the purported falsity of the statements more than one year before the initial Complaint was filed, since the sale of UCMC occurred sometime in early 1993. (Hearing Tr. At 41; *See* Am.Compl., Ex. 42.) Thus, the CFIL claims are clearly time-barred and must be dismissed.

### D. The Massachusetts Consumer Protection Act

█ The Massachusetts Consumer Protection Act ("MCPA") provides in relevant part that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen.Laws. ch. 93A, § 2(a). Lynch alleges that defendants violated the MCPA when Broockman and Jones made misrepresentations to her about the Marblelife system during meetings held in Massachusetts, in order to induce her into entering into the Franchise Agreement. (Am.Compl. at ¶¶ 94–96.) Defendants, citing scant law in support of their position, claim that the cause of action under the MCPA is barred by its four-year statute of limitations, *see* Mass.Gen. Laws ch. 260, § 5A, and that no tolling provision under Massachusetts law applies to MCPA claims. (Del.Br. at 25; Def. Reply Br. at 14.) Lynch, whose argument is equally bereft of legal authority, claims that the "discovery rule" saves the MCPA claim from being barred under the statute of limitations.

Whether or not the four-year statute of limitations bars the claim hinges on when the MCPA cause of action accrued, and there-

---

**38.** Again, based on Exhibit A to the Gildin Affidavit, it appears that Lynch actually signed her agreement on October 8, 1991. *See supra* note 6.

The point is academic because, as with the CUTPA claim, Lynch's CFIL claim is still time-barred if the October 8, 1991 date is applied.

fore, when the statute of limitations began to run. If, as defendants argue, the cause of action accrued when Lynch signed her Franchise Agreement, she is clearly barred from bringing this claim. However, under Massachusetts law, a claim brought under the MCPA that is grounded in fraud on the part of the defendant, as is the one pleaded in the Amended Complaint, does not begin to accrue until the plaintiff "knew or reasonably should have known" of the deceptive conduct, *Eaton Fin. Corp. v. Dunlavey*, No. 9114, 1991 WL 241863, at *6 (Mass.App.Div. Nov.7, 1991); *accord Cargill v. Gilmore*, No. 920485G, 1993 WL 818899, at * 3 (Mass.Super. Aug.18, 1993), or, put another way, "when the plaintiff knew or should have known of appreciable harm resulting from the defendant's [deceptive conduct]." *International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass.App. Ct. 215, 560 N.E.2d 122, 126 (1990); *accord Cambridge Plating Co. v. Napco, Inc.*, 991 F.2d 21, 25 (1st Cir.1993) (construing accrual of chapter 93A claim under Massachusetts law), *aff'd in part and vacated in part after remand*, 85 F.3d 752 (1st Cir.1996); *Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 994 (1st Cir.1988) (same); *see also Bouchie v. Atlantic Chrysler, Plymouth, Toyota Inc.*, No. 9350, 1996 WL 210685, at *2 (Mass.App.Div. Apr.8, 1996) (accrual date for chapter 93A cause of action determined in accordance with same principles governing accrual of the underlying cause of action); *Demoulas v. Demoulas*, No. 902344B, 1993 WL 818620, at *11 (Mass.Super. Oct.4, 1993) (fraud cause of action accrues when the plaintiff learns or reasonably should have learned of the fraud).

The record as it now stands does not establish as a matter of law that Lynch's claim under the MCPA is time-barred. The earliest date that Lynch admits she was aware of the falsity of the representations is 1992 (Am. Compl. at ¶ 54), which puts the claim well within the four-year statutory window under the MCPA. Moreover, defendants have not pointed to anything in the record that would support a finding that Lynch should have known of the falsity of the statements in early October of 1991. Therefore, the MCPA claim cannot be dismissed at this juncture as time-barred.

■■■■ Defendants also attack the MCPA claim on the basis that, accepting all of the allegations in the Amended Complaint as true, plaintiffs fail to allege that the actions taken in violation of the MCPA occurred "primarily and substantially" within Massachusetts, as is required to state a claim under the MCPA. *See* Mass.Gen. Laws ch. 93A, § 11. The burden of proving that the conduct complained of did not occur primarily and substantially in Massachusetts rests on the defendant. *Id.; see also Clinton Hosp. Assoc. v. The Corson Group, Inc.*, 907 F.2d 1260, 1264 (1st Cir.1990); *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 672 (1985). Applying the relevant factors required under Massachusetts law to the allegations in the Amended Complaint, and construing the Amended Complaint in plaintiffs' favor, I find that the defendants here have not met this burden.

Massachusetts courts have identified three factors that, at a minimum, should be considered by courts in deciding whether or not a deceptive act or practice occurred primarily within Massachusetts for purposes of the MCPA. Those factors, none of which standing alone is necessarily dispositive, are (1) where the deceptive statement was made; (2) the location of the plaintiff when the plaintiff received and acted on the deceptive statement; and (3) the situs where the plaintiff suffered his loss as a result of the deceptive act or practice. *Bushkin*, 473 N.E.2d at 672; *Clinton*, 907 F.2d at 1265–66. Courts consider the second factor to be critical, *Compagnie De Reassurance D'Ile De France v. New England Reinsurance Corp.*, 57 F.3d 56, 90 (1st Cir.), *cert. denied*, 516 U.S. 1109, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995); *Clinton*, 907 F.2d at 1265–66, while the third factor appears to be the least weighty. *Clinton*, 907 F.2d at 1266; *Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 25 Mass.App. Ct. 302, 518 N.E.2d 519, 523, *review denied*, 402 Mass. 1101, 521 N.E.2d 398 (1988). Finally, if the factors are in equipoise, the "primary and substantial" requirement is not met, since the preponderance of the wrongful conduct cannot be said to have occurred in

Massachusetts. *Bushkin,* 473 N.E.2d at 672; *Compagnie Generale Maritime v. Central Int'l,* No. 921200, 1995 WL 809527, at *4 (Mass.Super. Mar.24, 1995).

Plaintiffs allege that the deceptive statements underlying the MCPA claim were made to and received by Lynch during meetings that took place in Massachusetts. (Am. Compl. at ¶¶ 94–95.) Lynch would have sustained any injury resulting from these misrepresentations in California, where she resides and where her Marblelife franchise is located. (*See* Am.Compl. at ¶ 6.) However, as to the critical fact of where Lynch relied on the misrepresentations, or where she signed her Franchise Agreement, the record is silent. Without additional facts, I cannot conclude that defendants have carried their burden of establishing that the deceptive conduct did not occur substantially and primarily in Massachusetts. Therefore, the claim under the MCPA cannot be dismissed.[39]

## *CONCLUSION*

For the foregoing reasons, I respectfully recommend that defendants' motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure be granted in part and denied in part. Specifically, I recommend that (1) the state statutory claims brought pursuant to the Texas Deceptive Trade Practices Act, the Connecticut Unfair Trade Practices Act and the California Franchise Investment Law be dismissed; (2) all claims against defendant UCC be dismissed; (3) the remedy for any breach of warranty claim against defendants UCMC and UCC&P be limited to the replacement or purchase price of the warran-

tied goods; and (4) all claims for tortious interference with prospective business relations be dismissed. Remaining in the case are (1) the claim brought pursuant to the Massachusetts Consumer Protection Act; (2) the breach of contract claims against UCMC and UCC&P; (3) the breach of warranty claims against UCMC and UCC&P, as limited above; (4) the fraud claims against all defendants except UCC; (5) the negligent misrepresentation claims against all defendants except UCC; (6) the civil conspiracy claims against all defendants except UCC; and (7) the tortious interference with contract claims against UCC&P and individual defendants Lutjen and Kennedy.

The parties are instructed to meet and submit a proposed plan and schedule for the completion of pre-trial discovery and other pre-trial activities in this matter within twenty days of the date of this order.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections. *See also* Rules 6(a) and 6(e) of the Federal Rules of Civil Procedure. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kimba M. Wood, United States District Judge, and to the Chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Wood. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of*

---

**39.** Defendants also claim that the MCPA claim should be dismissed because it is duplicative of the plaintiffs' breach of contract claims. However, Lynch is claiming that she was fraudulently induced to enter into the contract in violation of the MCPA. Therefore, the claim is not, as defendants argue, "dependent on" the breach of contract claim (*see* Def.Mem. at 25), nor does it merely allege harm as the result of a breach of contract. Indeed, the principle case relied on by defendants, *Northeast Data Sys. v. McDonnell Douglas Computer Sys. Co.,* 986 F.2d 607 (1st Cir.1993), specifically recognizes that a MCPA claim essentially alleging that a party was fraudulently induced to enter into a contract, as does the one here, is not duplicative of a breach of contract claim and thus may be brought pursuant to the statute. *Id.* at 610. Moreover, the court in *Northeast,* while noting that those MCPA claims involving the parties' rights and obligations under their contract could not survive because they were essentially breach of contract claims, sustained that portion of plaintiff's MCPA claim alleging fraud in the formation of the contract. *Id.* at 611.

*Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

May 20, 1997.